UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .    Chapter 11
                                    .
MORTGAGE LENDERS NETWORK USA,       .    Case No. 07-10146(PJW)
INC.,                               .    (Jointly Administered)
                                    .
            Debtor.                 .    March 20, 2007 (2:06 p.m.)
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1            THE CLERK: Please rise.

2            THE COURT: Please be seated.

3            MS. DAVIS JONES: Good afternoon, Your Honor.  Laura

4    Davis Jones of Pachulski, Stang, Ziehl, Young, Jones &

5    Weintraub on behalf of Mortgage Lenders Network USA.  Your

6    Honor, let me start on behalf of all of us and thank you for

7    letting us continue this hearing from yesterday.  There were

8    a lot of discussions that occurred with respect to the cash

9    collateral, and I think it has narrowed the issues that are

10   still open.  Your Honor, if I may, could we skip matter 1 on

11   the second amended agenda, which I refer the Court, and take

12   up matters 2 and 3 which I think I can dispose of quite

13   quickly.

14           THE COURT: Okay.

15           MS. DAVIS JONES: Matter 2, Your Honor, is the

16   motion of Wells Fargo as is matter 3 for relief from stay to

17   terminate the debtor as servicer and to transfer servicing.

18   Your Honor, the parties have agreed to a form of order to

19   allow the substitution of Wells Fargo Bank NA as the

20   replacement and servicer of MLN pursuant to the terms of the

21   servicing agreement and have agreed to modify the stay to

22   allow Wells to take reasonable steps to terminate MLN as the

23   servicer in accordance with the servicing agreement.  And,

24   Your Honor, we do have proposed forms of order that will do

25   that.  In addition, though, Your Honor, all parties have

1   agreed to reserve their rights with respect to the servicing

2   agreements and the trust loans.  Your Honor, the parties are

3   going to attempt to work out a procedure to resolve payment

4   of amounts owed to the debtor, and if successful, will lodge

5   a stipulation with the Court.  If we're not successful, Your

6   Honor, we'll probably be back before you in connection with

7   this issue, but we're hopeful that we'll be able to work it

8   out.  Your Honor, if I may, what I'd like to do is approach

9   with a form of order for matters 2 and 3.

10          THE COURT: Okay.

11          MR. BURNHAM: Your Honor, Noel Burnham from

12   Montgomery, McCracken, Walker & Rhoads on behalf of Wells

13   Fargo Bank National Association.  Debtor's comments with

14   respect to the resolution at this point of the two Wells'

15   motions is correct, and we expect to proceed accordingly to

16   try to resolve whatever remaining issues there are with

17   respect to the servicing agreement, but at least as to the

18   matters on the motion, this order will resolve those.

19          THE COURT: Okay.

20          MR. STAIB: Good afternoon, Your Honor.  Jason Staib

21   from Blank Rome on behalf of the Committee.  Your Honor, Mr.

22   Schaedle from our office handled this matter, and as I

23   understand it, the Committee does not have an objection to

24   the limited stay relief sought by Wells.  Mr. Schaedle asks

25   that I read a rather long-winded reservation of rights into

1    the record, which I'll do with your permission.

2              THE COURT: Okay.

3              MR. STAIB: "In connection with the release sought

4    by Wells' stay and the Committee's non-objection, the

5    Committee reserves all of the debtor's estates and creditors'

6    rights and claims including without limitation for

7    remittances, reimbursements, refunds, servicing, payments,

8    offsets, and fees related to debtor receivables and payment

9    in tangibles and/or relating to and in connection with the

10   1999-1 and 1999-2 servicing agreements, the 2000-1 pulling

11   agreement, and related documents, agreements and instruments

12   against Wells in any capacity, FSA, each of the Mortgage

13   Lenders Network Home Equity Loan Trust 1999-1 and the

14   Mortgage Lenders Network Home Equity Loan Trust 1999-2.

15   Other parties to the servicing pulling agreements, MBIA, any

16   successor servicer or sub-servicer and against collection or

17   servicing accounts.  The Committee asserts and believes that

18   the parties all agree that nothing in the debtor's agreement

19   to the stay relief granted today nor the replacement of the

20   debtor as servicer creates administrative expenses or other

21   claims against the estate.  Each of Wells, the Trust, FSA and

22   MBIA likewise reserve all of their rights and claims in

23   connection with the foregoing."

24             THE COURT: Okay.

25             MR. BURNHAM: With that, Your Honor, I request

1  permission to be excused from the rest of the hearing.

2          THE COURT: Okay.  I've signed the orders.

3          MR. BURNHAM: Thank you, Your Honor.

4          MR. GODSHALL: Good afternoon, Your Honor.  Brad

5  Godshall on behalf of the Pachulski firm on behalf of MLN.

6  Number 1 on the agenda is the continued motion of the debtors

7  concerning DIP financing and cash collateral use.  Your

8  Honor, since the last hearing - well, I guess to go back

9  further, the last hearing ended, Your Honor, with the debtors

10  finishing the direct examination of the chief restructuring

11  officer of the debtor, Dan Skuller (phonetical).  Before

12  cross-examination started, the Committee and RFC and the

13  debtors mutually agreed to a continuation of the hearing and

14  a hopeful resolution of issues.  Since that time, Your Honor,

15  a lot has happened.  Let me go through what's happened,

16  because I think it will put the hearing today in context.

17  There was a lot of discovery.  The debtors obviously

18  continued operating in the interim, and operated in a manner

19  which was favorable to what had been projected in the budget.

20  The Committee filed a supplemental objection on Friday, which

21  I assume Your Honor has reviewed.

22          THE COURT: Yes.

23          MR. GODSHALL: And there's been a tremendous amount

24  of negotiation.  I believe that as we sit here today, we are

25  down to perhaps four contested issues with respect to the

1    debtor's motion, but I'm not exactly sure, and I don't want

2    to put words in the Committee's mouth.  The Committee will

3    advise you as to exactly what they're still objecting to.

4    So, I think there's been a tremendous amount of hard work

5    that's gone into resolving what were very, very numerous

6    objections by the Committee.  Your Honor, the most

7    significant single change in the landscape, as we stand here

8    today as compared to the last hearing, is the debtors no

9    longer believe that they need DIP financing.  The debtors

10   believe that we can get to April 28 at which time all

11   business operations of the debtors presumably will be

12   terminated.  There may be odds and ends in terms of assets to

13   sell, but in terms of the business of servicing loans, and we

14   think we'll be done with that by April 28, and we believe we

15   can get there simply using cash collateral.  So that's

16   obviously an important change, and it's a change which, you

17   know, we think resolves a lot of the objections that the

18   Committee had - the Committee still has objections, but I'm

19   sure they're more comfortable with what is being proposed now

20   than they were at the last hearing.  We gave Your Honor a

21   redlined form of order only about a half an hour ago.  I'm

22   sure Your Honor hasn't had a chance to go through it yet, and

23   the redline is a redline back to the interim order.  There's

24   going to be a tremendous amount of redlining that you'll see

25   there because it's been changed from an interim order, which

approved financing, to a final order which only approves cash
collateral use. So there's going to be a lot of changes
there that are unavoidable. Attached to that - and Mr.
Lenhart on behalf of RFC, you know, will walk through the
order with you and show you - walk you through all the
changes and the various objections of the Committee that the
changes were intended to address. So we'll go through that.
We also have a new budget attached to the order which is
different from the budget that was attached to the interim
order. It's different in some ways that are unavoidable. We
actually have actual operating results where we had
projections for, you know, the interim weeks here. The order
- I mean, I think it would be fair to say that the budget
overall reflects more favorable performance than was
reflected in the budget concerning the interim hearing. I
know the Committee wants to cross-examine Mr. Skuller. They
didn't have the opportunity to do that at the initial
hearing. I don't know how Your Honor would like to proceed,
if Your Honor would like to go through what the open issues
are first or whether Your Honor would like to hear the cross-
examination of Mr. Skuller first, you know, we'll proceed in
whichever way Your Honor believes that will be the most
constructive.

THE COURT: Okay, well, let me hear from the
Committee then.

1          MR. GODSHALL: Yes.

2          MS. KELBON: Good afternoon, Your Honor, and thank

3    Your Honor for extending this time to us.  Your Honor, the

4    Committee is here today to oppose the cash collateral revised

5    request on the basis of the terms and conditions that RFC is

6    seeking to impose on the debtor.  We still have a number of

7    serious concerns that have been reflected in this revised

8    order that we feel have to be addressed, and we also believe

9    that we will be putting on evidence for Your Honor to show

10   that the use of cash collateral is a contrived use.  The way

11   the budget has been revised shows a potential use of cash

12   collateral that we believe will not be necessary.  So, we do

13   not think they will be able to show a need for cash

14   collateral, and moreover, even if the debtor did need cash

15   collateral, Judge, we don't think that the terms and

16   conditions which RFC is imposing on the debtor for the use of

17   this cash collateral are fair or reasonable under the

18   circumstances, and if you'd like me to go through the

19   specific ones that are objectionable to the Committee, I can

20   do that right now, Your Honor.

21          THE COURT: Okay.

22          MS. KELBON: First, Your Honor, is the so-called

23   diminution claim, and it probably would be helpful if we turn

24   to the language in the order.  It's pages 19 and 20.

25          MR. GODSHALL: Your Honor, may I ask if you have the

1    blackline that the messenger -

2              THE COURT: Yes.

3              MR. GODSHALL: Okay, thank you.

4              MS. KELBON: Your Honor, it reads: "As adequate

5    protection for lender in respect of any diminution -"

6              THE COURT: I'm sorry, whereabouts on 19?

7              MS. KELBON: I'm sorry, number 3, Your Honor, at the

8    bottom.

9              THE COURT: Number 3?

10             MS. KELBON: Yes, Your Honor.

11             THE COURT: Okay.

12             MS. KELBON: "As adequate protection for lender in

13   respect of any diminution in the value of lender's interest

14   in the pre-petition collateral resulting from (1) debtor's

15   use of cash or (2) debtor's breach after the petition date if

16   such breach constitutes a failure to act in a commercially

17   reasonable manner with respect to any obligation set forth in

18   this order regarding servicing, sale, or transfer of MLN

19   owned loans."  If I could just stay with that, Your Honor.

20   The MLN owned loans are the loans that are the loans that

21   generate the cash collateral.  There's three kinds of

22   proceeds: the debtor originated these loans, they're on the

23   warehouse line, and they're pledged to RFC.  There was about

24   420 million on the filing date.  Since the sale a couple of

25   weeks ago, I think they're down to about 80 or 100 million.

1    We have these loans.  They're generating principal and

2    interest payments from the underlying mortgagors.  That is

3    the permitted cash collateral that's going into the cash

4    collateral account.  There's also other proceeds.  A

5    mortgagor may pay off their loan, they may refinance.  That's

6    not permitted cash collateral.  That goes directly to RFC.

7    It pays down their pre-petition claim.  The debtor is not

8    using the mortgage loans.  They're servicing them for RFC's

9    benefit.  They're not getting a servicing fee for that, and

10   they are actively trying to sell them for RFC's benefit.

11   This order in addition to do other things for RFC grants them

12   immediate stay relief.  If there's a breach of a sale or

13   breach of a servicing or a breach of a transition, the law

14   gives RFC, at best, a replacement lien for the use of their

15   cash.  We understand that, Your Honor.  They would get a

16   replacement lien on unencumbered assets for the actual cash

17   that might be used in that cash collateral account if that

18   cash or that lien that proves to be inadequate, then they get

19   a super-priority claim under 507(b).  That is what the law

20   gives them.  If the lien they get is inadequate, they get a

21   super-priority claim.  They don't get a super-priority claim

22   and a lien for a post-petition breach.  The remedy in this

23   Circuit is to seek relief from the stay.  They have that

24   already in this order.  They can take back their collateral.

25   If there is a breach, they take back their warehouse loans.

1    The cash collateral is a separate issue.  It's sitting in the

2    cash collateral account.  That is being protected.  That's

3    all they're entitled to protection for.  We have a real

4    problem with the order as drafted that they're trying to

5    impose some amorphous diminution claim as a super-priority

6    claim and a lien that goes on in the following pages on all

7    assets for this so-called potential breach.  Your Honor, that

8    is a very big issue for this Committee.  The second issue,

9    Your Honor, that we are concerned about is the 506©) waiver,

10   and again, I think it would be helpful if we turned to the

11   language - Since I'm not as familiar with this blacklined

12   order, it's going to take me a second, Your Honor.  It's on

13   page 25, Your Honor, paragraph (5).  It recites: No cost or

14   expenses of administration or other charge, meaning

15   assessment or claim incurred at any time on or before a

16   termination date, by the debtor or any person or entity shall

17   be imposed against lender, its claims, or its collateral

18   under 506©) of the Code or otherwise, and it goes on as well,

19   Your Honor.  Your Honor, we believe that there have been

20   tremendous benefits that RFC has been given in this case, and

21   the Committee would like to preserve any 506©) potential

22   surcharge for this estate.  Moreover, we believe that that

23   language goes beyond just the 506©) waiver, and it prohibits

24   any claim.  It says "or otherwise that could have been

25   imposed on them."  So, we think that language is similarly

1     problematic.  The third issue, Your Honor, is the control

2     over the budget process.  By means of the interim order and

3     now this third budget that we're seeing, Your Honor, again,

4     RFC has effectively neutered the Committee from carrying out

5     its duties in this case.  They have provided the Committee's

6     professionals with just $300,000 for the period of February

7     20 through April 28th and they prohibit the debtor from paying

8     professionals any amounts in excess of that from unencumbered

9     cash.  In stark contrast, RFC has agreed during the same

10     period to provide the debtor's professionals with 1.9 million

11     plus $722,000 of pre-petition retainers.  In our view, Judge,

12     this treatment is unfair and inappropriate.  Moreover, RFC

13     has exclusive control over the budget, and they will not give

14     the Committee a veto power over any changes to the budget.

15     The Committee was very concerned that there were payments of

16     pre-petition claims made.  We want to insure that that does

17     not happen further.  We don't want any changes to the budget

18     without our consent.  The other issues, Your Honor, that we

19     have, have to deal with all of these imposed obligations on

20     the debtor.  It was first under the guise of the DIP

21     financing.  Now it's under the heading of cash collateral.

22     There were three kinds of loans that the debtors serviced in

23     this case that relate to RFC.  The first kind was called the

24     Master Service Loans.  That was the big $8 billion portfolio.

25     They were serviced under pre-petition agreements that were

1    purportedly terminated by RFC pre-petition, around, I

2    believe, January 24th.  Yet the order imposes continuing

3    obligations on this debtor as debtor obligations, which but

4    for this order, they would be pre-petition claims at best.

5    The next type of loan - excuse me, loans that the debtors

6    service are called the Emaxed Service Loans.  These are loans

7    that the debtor originated, and I believe they sold them to

8    Emax.  Emax used funds from RFC, a warehouse line with RFC.

9    So RFC is a secured creditor of Emax on those loans.  Those

10   loans are purportedly being serviced under an agreement

11   between the debtor and Emax which expired on February 28th.

12   Again, but for this order, there would be no continuing

13   ongoing servicing obligations.  We are concerned not only

14   that the debtor has undertaken these obligations, which would

15   be fine in and of itself if that is the debtor's business

16   judgment, but, Your Honor, they are now exposing themselves

17   to a breach for such servicing obligations if in fact there's

18   a breach of that obligation.  The order also has the debtor

19   obligated to actively sell loans for RFC's benefit.  Our

20   position is, if you want to put these provisions in the

21   order, they should be limited to a termination of cash

22   collateral, if there's a breach, or relief from stay to move

23   the servicing but not impose further claims on this estate.

24   Your Honor, there's other language issues I have with the

25   order, and I can go through that, but I think they're much

1    less significant, but I would like to reserve the right to

2    just go through and try to resolve some specific language

3    with some of the blackline that I just saw.  Would you like

4    me to do that now?

5         THE COURT: No, but on the last point you made, the

6    imposed obligation, I don't know where in the agreement those

7    are recited.

8         MS. KELBON: They used to be paragraph (9) so I'll

9    try to - I think it's now - It may be (6).  It's (6) and then

10   it's later on and further in the Events of Default section as

11   well.  The debtor agrees to do the following - This is at

12   page 25, 26, and there's also further obligations - or I'm

13   going to have to look at my notes, but - I believe it also

14   comes in in the paragraph (7) under Modification of the Stay,

15   and I have to just - if you'll give me a moment, I could find

16   that for Your Honor as well.  Your Honor, for these reasons,

17   the Committee is very concerned about granting the debtor use

18   of cash collateral to give RFC these super-priority liens and

19   claims and other potential claims against this estate.  We do

20   believe that if the debtor did need cash collateral, it

21   should have the ability to come into this Court and seek to

22   use it, grant them a replacement lien and their diminution

23   claim for the use of that cash collateral, but at this time,

24   Your Honor, we don't think that need actually exists.  Thank

25   you.

1          MR. GODSHALL: Your Honor, would you like me to

2     respond to the issues?

3          THE COURT: Yes, but bear in mind that I have not

4     read this proposed form of order, so, I'm somewhat at a loss

5     to specifically digest the fourth objection raised by the

6     Committee.  I think I understand the first two even without

7     reading the document.

8          MR. GODSHALL: I actually listed five objections.

9     I'll go through five, and we'll see how we numbered them

10    differently than Your Honor.

11         THE COURT: Okay.

12         MR. GODSHALL: First of all, Your Honor, with

13    respect to the diminution claim and the language that counsel

14    referenced as objectionable, which is in paragraph (3) on

15    page 19 of the order.  Your Honor, this order, to the

16    debtor's mind doesn't give a collateral diminution claim to

17    RFC.  The Bankruptcy Code gives a collateral diminution claim

18    to RFC.  What the debtor intended to do in paragraph (3) is

19    to limit that claim not expand it, and I think Committee

20    counsel has too narrow a view of what a collateral diminution

21    claim might consist of.  If this was the ordinary kind of

22    manufacturing case, Your Honor, where the debtor manufactured

23    widgets, and the widgets were sold today in accounts

24    receivable, and the accounts receivable had a value of let's

25    say of $2 million on the petition date, and at a date

1 sometime in the future it could be established that the

2 accounts receivable had diminished to a million dollars, my

3 understanding of the law, Your Honor, is that you have a

4 collateral diminution claim of a million dollars.  Now,

5 Committee counsel seems to be taking the position that that

6 is not correct, that just because the value of the accounts

7 receivable has reduced from 2 million to 1 million over a

8 period of time, doesn't necessarily result in a diminution

9 claim.  That the diminution has to be by reason of the use of

10 the debtor of that cash collateral, and, Your Honor, I think

11 that's much too narrow.  If the debtor hasn't taken care of

12 the collateral, if it hasn't gone out and collected the

13 receivables or done what is necessary to protect the value of

14 the cash collateral, that's what gives rise to a diminution

15 claim.  So here, Your Honor, counsel correctly characterized

16 the nature of the cash collateral.  It's the principal and

17 interest.  It's the value of this loan portfolio that the

18 debtor owns and the debtor services and which is subject to

19 the lien of RFC.  Now, we're going to use cash collateral.

20 We're going to use the principal and interest relating to

21 those loans, and there's no dispute that our actual use of

22 that principal and interest, since it's not going to be

23 replaced, because we're not replacing cash collateral in this

24 case, Your Honor, that would clearly give rise to a

25 diminution claim.  RFC also felt that since we were basically

1  the caretaker of this collateral that if the value of that

2  collateral diminished during the case because the debtor

3  didn't properly service the loans, or otherwise, you know,

4  did something, you know, that was - you know, whatever, if

5  the debtor did something which diminished the value of that

6  collateral that it might give rise to a diminution claim, and

7  under the law that would probably be, in our view, be a

8  reasonable position for them to take.  It's certainly a

9  litigable position.  So what the debtor did is to try to

10  narrow that possible claim because the debtor was concerned,

11  Your Honor - The debtor was concerned that it may not be able

12  to adequately service, i.e., take care of the cash collateral

13  of RFC through no fault of its own because everybody

14  understands that this debtor is in a very precarious

15  position.

16          THE COURT: I'm sorry.  It is the debtor's need to

17  use the cash collateral?  Is there a need to use the cash

18  collateral?

19          MR. GODSHALL: Yes, there is a need under this

20  budget to use cash collateral before April 28th, not a lot,

21  probably less than a million dollars, but to get the wind-

22  down completed, there is expected to be a need for a use of

23  cash collateral.  So, what we did, Your Honor, what we got

24  RFC to agree to is that there wouldn't be a diminution claim

25  because we didn't take care of the cash collateral unless the

1  failure to do so was by reason of some behavior that was

2  something other than commercially reasonable.  In other

3  words, Your Honor, if our servicing department all gets up

4  and quits tomorrow because they see no future at MLN, that's

5  not our fault, and RFC has bought into that risk.  And so,

6  this language limits their diminution claim in that scenario.

7  It says that as long as we can say - RFC has agreed that as

8  long as we can establish to Your Honor that we've done what

9  we can do, given the difficult financial circumstances that

10  we're under, that they will not have a diminution claim in

11  that scenario, for example, because we just don't have the

12  financial wherewithal to keep those people onboard.  So, we

13  weren't trying to create -

14         THE COURT: Okay, so - I'm sorry for the

15  interruption -

16         MR. GODSHALL: Sure.

17         THE COURT:  - but Im seeing this for the first

18  time.

19         MR. GODSHALL: Sure.

20         THE COURT: So you're saying that clause Romanet II

21  is addressing the issue you're talking about where -

22         MR. GODSHALL: Yes.

23         THE COURT:  - the debtor's breach causes the

24  diminution.

25         MR. GODSHALL: Yes, and what it says is that it has

1    to be basically an intentional breach as opposed to - and a

2    breach that we just can't avoid -

3          THE COURT: Okay, that's if the breach constitutes

4    failure to act commercially reasonably.

5          MR. GODSHALL: Yes, yes.  So we're trying to limit

6    the diminution claim that might be asserted not expand it.

7    Now we may have a difference of opinion with the Committee on

8    what gives rise to a diminution claim, but I don't think

9    we're fighting about a lot here, because again, we thought we

10   were limiting a diminution claim.  They're concerned that by

11   putting this in here we're expanding it, and I think that -

12         THE COURT: Let me ask you this question -

13         MR. GODSHALL: Yes.

14         THE COURT: We read everyday about what's happening

15   in the sub-prime industry.  Suppose the value of the

16   portfolio loses value significantly just because of what's

17   happening in the industry?

18         MR. GODSHALL: I'm glad you're asking me that, Your

19   Honor, because that's exactly what this was supposed to carve

20   out as a possible ground for a diminution claim.  Because

21   when you look at Romanet I and Romanet II, those are the only

22   instances in which RFC's allowed to assert a diminution

23   claim.  And your hypothetical?  That would not be diminution

24   by reason of our use of cash collateral, and it would not be

25   diminution because we've acted in something other than a

1   commercially reasonable manner, and I'm sure RFC would get up

2   here and confirm -

3           THE COURT: Assuming you can prove that it's market

4   driven -

5           MR. GODSHALL: Yes.

6           THE COURT:  - no fault of anybody except the

7   market.

8           MR. GODSHALL: Yes, yes, that's exactly what this

9   was supposed to limit in terms of a collateral diminution

10  claim.  So, I'm not sure why we're at odds with the Committee

11  on this first objection.  I think this is a good thing for

12  the estate not a bad thing.  We're happy to try to resolve

13  objections while we're here, but we think this objection is

14  not well-taken for the reasons I've just stated.  Now I can

15  go onto number 2 or you can hear from -

16          THE COURT: No, why don't you cover all four or five

17  as your - for your count.

18          MR. GODSHALL: Sure, Your Honor.  The second

19  objection that I identified is on page 29, paragraph (5), and

20  this is the surcharge waiver.  And, Your Honor, this is not

21  an issue that the debtor feels as strongly about.  This is

22  obviously something that RFC's requested.  I'm sure Your

23  Honor has seen requests for surcharge waivers a thousand

24  times, you know, in your career as a judge.  They're

25  obviously, absolutely standard in the context of DIP

1    financing to get some sort of a surcharge waiver.  I think

2    they're less standard in the context of a cash collateral use

3    request which is what we have here.

4         THE COURT: Well, I don't think they're standard in

5    a conventional DIP facility, not in my Court anyway.

6         MR. GODSHALL: Well, all right, well then -

7         THE COURT: Well, let me tell you what the law in

8    this Court's been for at least the last five years.  If the

9    Committee doesn't agree with the waiver, it doesn't happen.

10   I've had a couple of cases where the Committee has agreed to

11   it because of exigent circumstances, but absent the

12   Committee's approval I can't remember the last time I

13   approved such a waiver, if I ever did.

14        MR. GODSHALL: All right, well, then, in that case,

15   Your Honor, RFC's going to have a decision to make, and this

16   wasn't, obviously, something that the debtor negotiated for.

17   This is something that RFC has required.  Third objection I

18   heard, Your Honor, was RFC's control of the budget process

19   and this is maybe where your numbering and mine diverge

20   because under that heading I heard two separate objections,

21   and the first objection, Your Honor, is that this order only

22   permits professional fees to be paid in accordance with the

23   budget, and the budget has an amount of professional fees for

24   the Committee running through April 28 that is, I believe,

25   $210,000 for Committee counsel and $90,000, I believe, for

1    the Committee's financial advisors.  And, I think, Ms. Kelbon

2    accurately stated what this order does, which it says that if

3    there are fees that are incurred that are in excess of the

4    budget by a professional, they can't be paid even if

5    unencumbered funds exist to pay them.  The debtor, Your

6    Honor, understands why RFC wouldn't want these that are

7    outside of the - that are unencumbered to be used to pay what

8    they view as out-of-control professional fees because the use

9    of those funds to pay professionals today would likely

10   increase the need for cash collateral to be used to make

11   other payments tomorrow.  You know, I think that's their

12   rationale.  And the debtor is also sympathetic to RFC's

13   concern that with respect to the Committee, they have put a

14   lot of people on these cases, Your Honor, and the assets in

15   this case, the unencumbered assets in this case, we gave Your

16   Honor a chart on the first day of the case, and they can be

17   less than $10 million.  So in terms of cost benefit, in terms

18   of what the Committee's doing versus the asset base here,

19   it's a difficult situation.  So we're sympathetic with RFC's

20   concern in that regard.  On the other hand, we're very

21   sympathetic with the Committee's concern that the budgetary

22   limits that RFC has put on the Committee in this case seem

23   low, frankly, to the debtor given how complicated this case

24   is.  So, we don't view this, again, as the debtor's issue.

25   This is between RFC and the Committee in terms of, you know,

1    how much cash is going to be available to pay Committee fees

2    before April 28th when hopefully RFC is out of the picture,

3    and I don't know how to resolve that issue.  Now, the second

4    objection under control of the budget process I heard from

5    Committee counsel is that the Committee wants a veto power on

6    the budget as the budget changes, and as to that issue, Your

7    Honor, the debtor does have a position.  The debtor objects

8    to giving the Committee blessing on the budget.  If there are

9    some particularly sensitive areas that the Committee is

10   concerned about, we would be happy to listen to those, Your

11   Honor, but the budgeting process is an iterative process, and

12   we're on our third budget in this case.  By next week there

13   might well be a fourth budget and a fifth budget.  It's a

14   fluid situation, and we're constantly updating that budget,

15   and we do not want to be in a position where we're running

16   back to Your Honor every week because the Committee wants to

17   substitute its own business judgment for the business

18   judgment of the debtor's management at this point in terms of

19   the budget.  Again, if there's something in particular that

20   they're concerned about, that's fine, but the budgets here

21   are changing all the time, and we can't basically have shadow

22   management of the budget in process by the Committee.

23   Lastly, Your Honor, there was a concern articulated by

24   Committee counsel that within this DIP financing order the

25   debtor has imposed upon it servicing obligations, and, Your

1    Honor, those servicing obligations are contained at section 6

2    of the order which begins on page 25 of the redline.  Your

3    Honor, these servicing - Well, let's back up.  I have to give

4    Your Honor some history.  Your Honor, because the servicing

5    arrangements that the debtor was operating under were

6    terminated before this case was filed, we filed this case,

7    oddly enough, without any operative contracts that the debtor

8    was working under in terms of servicing loans, so the whole

9    basis of this case, Your Honor, was that the debtor was going

10   to continue servicing loans, and it has been servicing loans

11   until servicing could be transferred to avoid economic waste

12   and harm to mortgage holders and harm to the creditors of the

13   estate.  Because we had no operative contracts at the time,

14   as I said, the obligations to service had to be put

15   somewhere, and they were put in the financing order because

16   there was - it seemed like for no good reason other than

17   there was no other particular place to put them.  If they

18   weren't put in this financing order, Your Honor, it would be

19   a standalone contract, an administrative contract, and if the

20   debtor breached it, it would give rise, presumably, to an

21   administrative claim.

22           THE COURT: Okay, so I take it that you're still

23   servicing -

24           MR. GODSHALL: We are still servicing -

25           THE COURT: The RFC loans.

1          MR. GODSHALL: Yes, until -

2          THE COURT: I thought the intent of the pre-petition

3    termination was to complete that process by the end of

4    February?

5          MR. GODSHALL: And, Your Honor, we are now looking

6    at completing that process by maybe the middle of April.

7    It's just taken a little longer.  We are -

8          THE COURT: Why not have a separate contract?

9          MR. GODSHALL: We could have a separate contract,

10   Your Honor.  It wouldn't have any particular legal - it

11   wouldn't change the legal character of the agreement, but,

12   Your Honor, I wanted to call your attention, please, on to

13   page 27 at the bottom, paragraph sub-D.

14         THE COURT: D as in David?

15         MR. GODSHALL: Yes.  Your Honor, this is a very

16   important paragraph that's been added to the interim order,

17   and it seems to me again that whether the servicing

18   obligations are put in a separate agreement are in this

19   order.  This should give everyone a lot of comfort and ought

20   to resolve this concern because paragraph D also provides,

21   much like the language you saw earlier concerning the

22   diminution claim, that there is not going to be an

23   administrative claim no matter where the servicing

24   obligations are located unless there is a breach of the

25   obligations that constitutes a failure by the debtor to act

1    in a commercially reasonable manner.  In other words, Your

2    Honor, as far as I'm concerned, I interpret this language to

3    be a - it basically has to be an intentional breach as

4    opposed to a breach that's caused by, you know, our financial

5    condition.  So, if again, Your Honor, the Servicing

6    Department walks out next Friday, that's the most obvious

7    hypothetical scenario we could think of, there will not be an

8    admin claim concerning servicing that's caused by that event,

9    if they all walk out, as we just don't have the financial

10   ability to retain our people.  So, again, I understand

11   Committee counsel's issue that normally these servicing

12   obligations aren't contained, you know, in the financing

13   order, in the cash collateral order, but they were put here,

14   Your Honor, because that was the whole premise of this case,

15   is that we were going to use cash collateral to service loans

16   until that servicing could be transferred.  So that's why

17   they were put here.  Again, I don't think that's a

18   substantive issue.  The more substantive is whether the

19   debtor should be servicing at all, which is a legitimate

20   issue to raise, and if that servicing is going to potentially

21   give rise to a significant liability, that would be even a

22   more significant issue.  But given paragraph E here, which

23   basically says that there has to be some sort of level of

24   intentional misconduct for there to be liability, there's no

25   reason that the debtor shouldn't be permitted to continue

1    servicing, make its 32 basis points, and, you know, avoid

2    economic waste that would otherwise occur if these loans

3    weren't taken care of until there was a transfer.

4         THE COURT: Does this proposed order contain the

5    payment arrangement, the 32 basis points?

6         MR. GODSHALL: Yes.  So, thank you, Your Honor.  I

7    believe those are the objections I heard and those are the

8    debtor's responses.

9         THE COURT: I'm sorry, I think also in the imposed

10   obligations counsel for the Committee mentioned that there

11   was an obligation on the part of the debtor to help RFC sell

12   its loans.

13        MS. KELBON: It's page 27, Your Honor, C.

14        MR. GODSHALL: Yes, I mean, that's part of this

15   wind-down process.  I mean, loans get sold, we stop servicing

16   when the loans get sold.  It's part and parcel of the same,

17   you know, the same wind-down.

18        MR. LENHART: Your Honor, Chris Lenhart from Dorsey

19   & Whitney on behalf of Residential Funding Company.  On that

20   very last point, I point out that the loan sales that we're

21   talking about are only MLN owned loans -

22        THE COURT: I understand.

23        MR. LENHART: - not the Emax loans that remain.  If

24   I just may, if Your Honor would indulge me to speak on a few

25   of the points Mr. Godshall touched on, just to add some

gloss.  On the diminution claim, I don't know that I have a
lot to add to Mr. Godshall's argument other than he had
pointed out to Your Honor that debtor didn't need to use cash
collateral and he thought that the amount was about a
million.  As I look at the budget the debtor provided to us,
I think the max use on the week ending 4/7/2007 is actually
just a hair under 2 million, and again, on the point of the
diminution claim, Your Honor, and if you need time for me to
- on the point of the diminution claim, if they don't service
these loans, these are owned by MLN, if they don't service
them and they don't get the P&I that comes in, we have a
problem.  They're going to use this cash collateral.  This
is their - they own this.  They need, you know, to protect us
with respect to - We've agreed to give up market value.  Your
Honor correctly recognizes that could be a real issue, and we
agreed to give that up earlier in the interim order in fact.
Now all we're asking them for is if the debtor has a
servicing breach caused by authority to use commercial
reasonable efforts that that constitutes a diminution, and
we've actually - I don't think Mr. Godshall had pointed this
out, we further limited it, Your Honor, and if I can turn to
that part of the order.  This is another response to
Committee objection.  We had agreed to limit that claim on
page 21 of the blackline, Your Honor.  We've made some
further agreements.  That is, first of all, that we've set a

1   cap - I'm sorry, I'm in the middle of page 21.  We set a cap,

2   Your Honor, on any diminution claim that whatever amount that

3   would be.  The second thing is that we have agreed -

4         THE COURT: I'm sorry, you're looking -

5         MR. LENHART: It says, "The lender agrees that a

6   diminution claim under 2 above shall be limited to 5

7   million."  So there would be nothing in excess of that.  The

8   second point, Your Honor, is that as of March 16, 2007, we

9   stipulate that there is no diminution claim.  We're not aware

10  of facts that would give rise to that at this point, and

11  thirdly, that we'd have to give notice of any diminution

12  claim as of April 28, 2007.  So everyone knows there is an

13  ending point to this.  This is not going to float out there.

14  Those are the only points, in addition to Mr. Godshall's, I

15  would make on that.  With respect to the 506©) waiver, Your

16  Honor, if I might turn to that, and I understood Your Honor's

17  comments.  The only point I would make on that, Your Honor,

18  is we asked the debtor for a budget to include all

19  administrative expense costs, and we have agreed to make cash

20  collateral available in order to cover the entirety of those

21  costs, including, Your Honor, in addition to whatever it

22  takes to operate the business, $2.3 million worth of

23  professional fees over a 12-week period and again that

24  Committee will have been engaged for I think 9 weeks of that

25  12-week period in addition to providing a million dollar

1     carve-out thereafter, Your Honor.  So, we also agreed to make

2     a change to the order to make it clear that if there is a

3     termination date and at such point we're not permitting them

4     to use cash collateral any more, of course, there can be a

5     506©) claim after that period for anything they have to do

6     with respect to our collateral after we terminate their

7     ability to use cash collateral, but during the time we're

8     permitting it, Your Honor, we feel like we have been - we've

9     taken it what the debtor us they need it for operating

10    expenses.  We've taken it what professionals - We've taken a

11    budget number of 2.3 million for professionals over that time

12    period, we think is frankly generous and others will have

13    other opinions about that, but we think in exchange for that

14    we should know that no one is going to come in - our big fear

15    is that professionals will come in and surcharge our

16    collateral if in the event that they're not able to make

17    themselves whole out of the 2.3 million that we budgeted.

18    With respect to the budget process, Your Honor, and the

19    amount of fees, again, I've made reference to what that

20    number is in the aggregate.  The budget that you'll see

21    attached to that, Your Honor, does contain a $300,000 number

22    for Committee professionals because they were both counsel

23    and the financial advisors in a larger number for debtor and

24    its financial advisors.  Quite frankly, Your Honor, we had

25    previously offered to lump this into one number so as not to

1  break that out amongst the people, and that was not

2  acceptable to at least some of the professionals.  We also

3  understand, Your Honor, that in Delaware, we're familiar with

4  case law that may not hold a particular professional to

5  whatever their number is and by the understanding that it's

6  to be lumped together, and that's why we suggested that as a

7  solution.  It was not accepted, Your Honor.  So -

8         THE COURT: Let me just - I have imposed that as a

9  solution on prior occasions.

10        MR. LENHART: I can't suggest - I can't tell Your

11 Honor what position of other professionals is in this room

12 would be.  I can only tell you RFC tried to suggest that as a

13 solution, and I can't speak for the other professionals as to

14 how they would approach taking it in that manner, Your Honor.

15 But again, one of the things that was mentioned is that

16 there's no - we have not in this order granted permission for

17 professionals to be paid in excess of the budgeted amounts

18 even at unencumbered assets.  Let me explain a little

19 background as to that, understanding why that is.  In the

20 interim order there was an excess cashflow provision in the

21 order that provided that if the debtor is hitting home runs

22 after 30 days after the interim order, they would be able -

23 the ability to sweep the cashflow, take that excess cash and

24 to fund the professional fee reserve with it.  Thankfully and

25 gratefully, the debtor has done a good job here and they have

1   been able to do that and they now have their funds available

2   to fund the professional fee reserve; okay?  So, we would

3   permit that, we want that to occur, but what we don't want to

4   have happen is if someone, a professional comes in on an

5   interim comp basis and has a number that's far in excess or

6   in excess of that budget, we don't want the debtor - or that

7   professional to be paid in excess of that because what that

8   does is, it doesn't provide RFC with adequate protection with

9   respect to their remaining unencumbered assets that exist.

10  The budget, you'll see, Your Honor, has $2.5 million in cash

11  at the end of it, after RFC is completely paid off, and it's

12  to that those professionals can look because we haven't fully

13  funded a carve-out portion, it's to that the professionals

14  can look for if there's an excess in fees beyond, again, the

15  pot, the $2.3 million that we're agreeing to pay.  I won't

16  address the changes to the budget without consent of

17  Committee other than to say we agree with Mr. Godshall's

18  presentation of that issue and we point out that one thing we

19  have agreed to is that we cannot reduce the amount of

20  professional fees in the budget without the consent of the

21  Committee so we can't play with that number.  On that last

22  piece, Your Honor, on the servicing and the breach of

23  servicing - Again, Mr. Godshall pointed out the concession

24  that RFC was certainly willing to make on that point to make

25  it clear.  I want Your Honor to know while there was a

1  termination of servicing rights with respect to the master of

2  service loans prior to the petition date, there was still a

3  post-termination of obligation of MLN to make sure there was

4  an orderly transfer of those loans; okay?  There is nothing

5  that provides MLN is to be paid for that ability during the

6  time they're transferring to be paid a servicing fee.

7          THE COURT: Does the service agreement address that

8  issue?

9          MR. LENHART: The servicing agreement certainly

10  addresses a post-termination obligation to transfer -

11          THE COURT: And what does it say?

12          MR. LENHART: Your Honor, the servicing agreement

13  between Emax and the debtor - and I'll step back.  Emax is

14  the entity who had - RFC and Emax had a servicing agreement

15  between them.  MLN acts as sub-servicer.  Emax contacted with

16  MLN to sub-service those loans.  Again, we're talking about

17  the master service loans at this point.

18          THE COURT: And these are loans owned by your client

19  that Emax is servicing for?

20          MR. LENHART: These are actually loans not owned by

21  my client.  My client is the master servicer for these loans.

22          THE COURT: Okay.

23          MR. LENHART: These loans are owned by

24  securitization trusts?

25          THE COURT: Okay.

1          MR. LENHART: The servicing agreement between -

2          THE COURT: I'm sorry, and you say you gave the

3     servicing to Emax and Emax gave it to the debtor?

4          MR. LENHART: That's correct, Your Honor.  The sub-

5     servicing, Emax gave to the debtor.  And the agreement

6     between Emax and the debtor by which that sub-servicing was

7     given, provides that - I can read this to Your Honor if you

8     would like.

9          THE COURT: Okay.

10          MR. LENHART: "In connection with any termination of

11    this agreement", this agreement being the sub-servicing

12    agreement, "the servicer", that would be MLN - Your Honor,

13    I'll continue reading, "In connection with any termination of

14    this agreement", sub-servicing agreement, "servicer", and

15    that is MLN, "agrees to cooperate with GMAC/RFC to affect an

16    efficient and orderly transfer of servicing responsibilities

17    as required by § 218 of the Servicer Guide."  And so, Your

18    Honor, there is an obligation that MLN has to orderly

19    transfer these now.

20          THE COURT: Without compensation?

21          MR. LENHART: Well, let me just go through the

22    options that maybe MLN had as of the petition date, let's try

23    that.  I suppose MLN could have chosen to simply say, These

24    post-termination obligations, those arise under pre-petition

25    agreements or executory contracts, I can reject those, and if

1  I do that, what's my risk.  My risk is I might have

2  significant - This an $8 billion loan portfolio.  If they

3  decide to hand over the keys we're obviously going to have a

4  problem of missing mortgage payments.  They have no phone for

5  people to call up and figure out what's going on with their

6  loans, and these are sub-prime loans so to the extent that

7  someone has a check returned because no one is answering the

8  mail at MLN, it may be a bonus paid in error, we may not get

9  paid anymore.  These are all risks that the debtor had to

10  assess, I presume, at the petition date and determine whether

11  they wanted to reject that contract or, and this is what MLN

12  decided to do, to accept a payment, a payment to which the

13  contract didn't entitle them, but to accept a payment post-

14  petition during the time it's servicing, and that - according

15  to the budget, Your Honor, that payment has been to date

16  about $1.65 million in servicing fees that RFC has paid to

17  MLN; okay?  And if Your Honor can look at the cost to

18  operate, the operating expenses here, this business is over

19  the last six weeks has not been operating at a loss, but it

20  made a decision, Your Honor, to decide to do that rather than

21  to terminate.  It decided that was the business decision it

22  wanted to make; okay?  All we've been saying is, that's fine.

23  We'll pay you.  We've agreed to do that and we have been

24  doing that.  To the extent that they breach - and again, Mr.

25  Godshall talks about an intentional breach, we've agreed to

1 pay that going forward.  There's something that comes with

2 that.  There's some protection that comes with that, and

3 that's this limited now protection that we've asked for.  So,

4 I would only point that out to Your Honor, that it seems that

5 the debtor had two choices.  It looked at both and decided to

6 make a choice that today, anyway, has been fairly lucrative

7 or at least it hasn't resulted in a - you know, a large

8 diminution in its unencumbered assets as some people think

9 that it has and it hasn't, and the budget will prove that

10 out, so.  Those are the points I have to make, Your Honor,

11 and I will let Committee counsel talk.

12          THE COURT: Okay.

13          MS. KELBON: Your Honor, if I could start back with

14 the diminution claim because I most respectfully disagree

15 with Mr. Godshall and Mr. Lenhart.  The Code does not give

16 them a diminution claim for a change in the value of the

17 collateral merely because of a breach of servicing or breach

18 of a sale obligation or breach of a transition.  507(b)

19 governs what they get, and it says, If the Trustee under

20 § 362(3) or (4) provides adequate protection of the interest

21 of a holder of a claim secured by a lien on property of the

22 debtor and if, notwithstanding such protection, such creditor

23 has a claim allowable under subsection (A)(2) of this section

24 arising from the stay of an action against such property

25 under § 362 from the use sale or lease of such property under

1  § 363 or from the granting of a lien under 4.  Then such

2  creditor gets a super-priority claim.  They are getting their

3  lien for the use of the cash.  They say they are stayed from

4  taking back their mortgage loans.  They can take them back

5  now.  They don't want them back.  They want the debtor to try

6  to actively sell them.  They want the debtor to service them

7  until they can find somebody to buy them.  So they can't

8  argue that they are being stayed and we are benefitted from

9  that.  They have the right to come in and seek relief from

10  the stay.  They don't want to do that, Your Honor, yet they

11  want to hold onto this potential diminution claim that now

12  they say could be $5 million against this estate.  And, Your

13  Honor, that's not what the Code provides.  Under Continental

14  Airlines you're not entitled to adequate protection until you

15  move from relief from stay.  The law –

16        THE COURT:  So, what do you want the debtor to do?

17  Consent to a lift stay and let them take their property?

18        MS. KELBON:  Your Honor, if that is the alternative

19  to getting a diminution claim of some $5 million against this

20  estate – We have to worry about the administrative claims and

21  how is giving the cash and the value of administrative estate

22  first to see if there's ever going to be recoveries for the

23  unsecureds to see if there can be pursuit of causes of

24  action.  We're never going to get to these deficiency claims

25  or the unsecured claims until we do that, so we have to

1    protect against admin claims, super-priority admins and

2    liens.  They're even getting themselves a lien for this.  The

3    Code does not say that.  So, I -

4           THE COURT: Okay, let me ask the debtor what their

5    position is with respect to your suggestion that they

6    surrender the property.

7           MR. GODSHALL: Your Honor, our position is that this

8    whole activity has actually been marginally profitable to the

9    debtor.  It has reduced the universe of unsecured claims that

10   the admittedly very small distribution to unsecured creditors

11   in this case might be payable to, and as long as no claim

12   arises unless the debtor has failed to act in a commercially

13   reasonable manner, we don't believe that an administrative

14   claim is at all reasonably likely to arise because we're able

15   to perform.  So why give up a moneymaking activity which

16   preserves property, reduces the universe of unsecured claims,

17   and to our point of view results in a very hypothetical

18   exposure to administrative liability if any at all.

19          MS. KELBON: And, Your Honor, I don't believe this

20   aspect is moneymaking.  They don't get the servicing fees for

21   servicing these loans.  They get the fees for servicing the

22   master service loans and the Emax service loans.  They get no

23   fee for servicing the MLN service loans is moneymaking.

24          MR. GODSHALL: That's correct.  On the MLN

25   servicing, on the MLN loans, Your Honor, we own the loans.

1    They're subject to our -

2              THE COURT: Right.

3              MR. GODSHALL: But they're all being serviced by the

4    same people.  So that subset of the service loan is not

5    moneymaking.  I misspoke.

6              THE COURT: But that's not to the benefit of RFC

7    because it's not their loans; is it?

8              MR. GODSHALL: They have a lien on the loan.

9              THE COURT: Oh, okay.

10             MS. KELBON: So, Your Honor, the diminution claim,

11   which then gives them this lien and it gives them a lien on

12   the proceeds of avoidance actions, which I must apologize,

13   Your Honor, I should have raised that in my opening

14   objections, it's less of an issue for us, the lien on the

15   avoidance actions, if it's junior to all administrative

16   claims.  We were told it was going to be that and now I just

17   see it says 503, it doesn't include Chapter 7 admins, which

18   it should, and -

19             THE COURT: Okay, look, I'm going to overrule the

20   Committee's objection on this point.  I think this is a

21   business judgment that the debtor's entitled to take and so

22   I'll overrule that objection.  As far as I'm concerned, the

23   506©) waiver is going to - is not going to remain, and I'm

24   not going to give this creditor an interest in avoidance

25   actions.  You didn't raise that before but -

1          MS. KELBON: I meant - I was trying -

2          THE COURT:  - is that still an issue?

3          MS. KELBON: Yes, Your Honor.

4          THE COURT: Okay.

5          MS. KELBON: Can I address the DIP budget and the

6     fees?  Despite the fact that counsel for the debtor thinks we

7     maybe have too many people on this case, this case has moved

8     fast, Your Honor.  We believe our fees are justified.  We

9     believe we've already earned our fees.  We saved the estate

10    $800,000 in DIP fees, commitment fees, and interest fees

11    causing expenses for an unnecessary DIP, which we stopped the

12    train on the that.  So I think we'll show the Court that our

13    fees are more than justified in this case, and we would ask

14    Your Honor to treat us pari passu with all professionals in

15    this case as Your Honor has done on numerous occasions, so we

16    would respond in that regard.  And as to the particular

17    points in the budget, our concern is the payment of pre-

18    petition claims outside of the ordinary course.  That is why

19    we wanted approval rights on the budget.

20         THE COURT: Is that in the budget?  The payment of

21    pre-petition claims?

22         MS. KELBON: Unfortunately, Your Honor, it has

23    occurred?

24         THE COURT: Pardon?

25         MS. KELBON: Unfortunately, it has occurred in this

1    case to date, and that is why the Committee wanted the extra

2    oversight.

3            THE COURT: And what do you mean by "extra

4    oversight"?

5            MS. KELBON: The approval rights on any revised

6    budget.  It showed up in negative variance items on the

7    budget, Your Honor, and part of our diligencing of the budget

8    that was presented at the last hearing, it came to light that

9    there was over a couple of million dollars of payments to

10   pre-petition unsecured creditors.  We raised this with the

11   debtor.  At that point, money was out the door, so we're

12   working with the debtor to see how possibly to recover it.

13           THE COURT: Well, if we could find them, they're

14   going to come back.  What objection would the debtor have to

15   the Committee vetoing your payment of a pre-petition

16   obligation?

17           MR. GODSHALL: Your Honor, there's no line item in

18   the budget for improper payment of the pre-petition claims,

19   so we - Counsel's concern doesn't - her remedy doesn't have

20   anything to do with her concern, because that's not in the

21   budget.

22           THE COURT: But I gather they're saying they want

23   the right to look over your shoulder that they don't

24   inadvertently get into the budget.

25           MR. GODSHALL: Your Honor, it was never in the

1    budget in the first place.  There is a question as to whether

2    these were - There is a servicing motion that Your Honor

3    approved that permits payments on pre-petition claims.  We

4    have to work through whether these were inappropriate

5    payments or not or if that's not the subject of this hearing,

6    and it doesn't have anything to do with the budget.  We will

7    commit to Your Honor right now that we will not include the

8    payment of pre-petition claims outside of the scope of

9    authority that Your Honor has already given us in the

10   servicing motion in the budget.  These items were never in

11   the budget.

12            THE COURT: What request is the Committee making

13   with respect to this problem?

14            MS. KELBON: Your Honor, the budget can be changed

15   and it can be changed with the consent of just the lender.

16   We don't want any changes made to the budget -

17            THE COURT: You can't make a change to the budget

18   that violates the Code.

19            MS. KELBON: Well, Your Honor, that's our point, and

20   we would like the ability to see it in advance -

21            THE COURT: I don't think I have to tell them that.

22   I think they know it.

23            MS. KELBON: Your Honor, you know, also part of this

24   was the identification of this $9 million of funds.  The

25   debtor has agreed to segregate those funds.  I don't know if

1  you've read our objection, but as part of the transition of

2  the servicing of the master service loan, there was $9

3  million that we believe will belong to this estate, and -

4           THE COURT: Okay, they've agreed to hold that into a

5  separate account.

6           MS. KELBON: They're going to put that in a separate

7  account and I think the order so provides for that, so, I do

8  want to say that.  I'm trying to see where that - what

9  objection that leaves me to respond to, Your Honor.  I think

10 it leaves me to respond to the obligations to sell and to

11 service.  Again, Your Honor, we don't think they're

12 appropriate obligations incorporated in the cash collateral

13 order.

14          THE COURT: Well, I'm going to overrule that

15 objection.  It's got to be someplace unless it's either a

16 separate contract or it's in this cash collateral order,

17 which is already a contract between the debtor and the RFC,

18 so I'm going to leave it there.  As far as I'm concerned, we

19 only have one contested issue, and that's the $300,000 limit

20 on the fees to the Committee under the budget and I'm looking

21 for a solution.

22          MR. GODSHALL: Your Honor, may I speak to that

23 issue?

24          THE COURT: And let me just comment.  I think the

25 debtor and counsel for the debtor and counsel for the

1    Committee should recognize that at the end of the day, this

2    is going to be a very small estate so far as the unsecureds

3    are concerned.

4            MR. GODSHALL: I understand.

5            THE COURT: And I'd rather not see that gobbled up

6    in the form of professional fees either as to the debtor or

7    the Committee.

8            MR. GODSHALL: Your Honor, we appreciate that, and I

9    think that general statement is separate and apart from the

10   specific issue we have here, and let me explain the position

11   of - well, frankly, of my law firm and Skuller Andrews on

12   this issue.  You know, when we negotiated the DIP financing

13   and the cash collateral stipulation in the original budget,

14   we were asked by RFC how much is it going to cost you, do you

15   think, to do everything you have to do to get all the loans

16   sold and the servicing transferred and deal with all these

17   prepared - preparation of schedules and everything else that

18   the debtor had to do, deal with all the regulators and

19   everyone else, and we gave them a number, and RFC agreed to

20   put that number in the budget.  Then they also put a number

21   for the Committee in the budget, and that was not the subject

22   of negotiation.  The Committee didn't even exist, Your Honor.

23   I heard what you said about keeping the fees down, but the

24   number that's in that budget for the Committee, we recognize

25   is far lower than the amount of fees that the Committee is

1    incurring.  So, Mr. Lenhart said his suggestion was we just

2    lump those together, and I realize that's a very eloquent

3    solution for RFC because it doesn't cost them a penney.

4                THE COURT: Well, I knew you wouldn't like it.

5                MR. GODSHALL: All right, but, I mean -

6                THE COURT: Pardon me, just so I understand.

7                MR. GODSHALL: Yeah.

8                THE COURT: What kind of a retainer did your firm

9    get?

10               MR. GODSHALL: Your Honor, our retainer going into

11   this case, I think, is $150,000.  We obviously got much more

12   in the way of payments than that, that monies were applied

13   against, but yeah, we came into this case with $150,000.  So

14   Mr. Lenhart's solution which now is that Skuller Andrews and

15   the Pachulski firm basically agreed to be paid, you know,

16   maybe 60 percent of what we had put in the budget because a

17   big chunk of the fees that were going to be paid to us now

18   needs to be paid to the Committee professionals because the

19   budget number for the Committee professionals is now very,

20   very low compared to what they're incurring.  It seems to me

21   to be grossly unfair to Skuller Andrews and Pachulski, and

22   that's why it was unacceptable to us, and again, that is with

23   complete sympathy to the fact that we believe that the

24   Committee number is too low, but the answer which is that

25   Pachulski and Skuller Andrews pay for it, didn't seem to us

1    to be an equitable resolution.

2           THE COURT: Okay, well, I think we're too far into

3    the case to have that solution, and, quite frankly, I think

4    that given the amount of work involved in liquidating the

5    balance of this company, I don't think that what was budgeted

6    for debtor's professionals is at all unreasonable.  But, that

7    still doesn't solve my problem because I think that the

8    Committee at the end of the day is likely to run up more than

9    $300,000 in fees and so I think we're, quite frankly, at a

10   impasse on this issue, and the only way I can resolve it is

11   to say that number has to change and if it doesn't change,

12   then I don't approve the cash collateral request.  So the

13   bottom line, where I am is, obviously that two of the

14   objections by the Committee I think are well-taken, and I'll

15   sustain them.  The others I'll overrule, and I want to see if

16   the parties can't reach some understanding with respect to an

17   increase in the allowance, the budget allowance for the

18   Committee, and why don't we take a brief recess and see if

19   that's doable.  If not, then I'll be pressed with a hard

20   decision to make.

21          MS. KELBON: Thank you

22          MR. GODSHALL: Thank you, Your Honor.

23          THE COURT: Okay, how much time?  Fifteen minutes,

24   twenty minutes?

25          MS. KELBON: Fifteen minutes -

1          MR. GODSHALL: Thirty minutes, Your Honor.

2          THE COURT: All right, 30 minutes.  Thirty minutes?

3    All right, we stand in recess.

4          (Whereupon at 3:16 p.m., a recess was taken in the

5    hearing in this matter.)

6          (Whereupon at 4:17 p.m., the hearing in this matter

7    reconvened and the following proceedings were had:)

8          THE CLERK: Please rise.

9          THE COURT: Please be seated.

10         MR. LENHART: Thank you, Your Honor.  Chris Lenhart,

11   again, of Dorsey & Whitney on behalf of Residential Funding

12   Company.  Your Honor, our mandate was to go out and talk

13   about and get authority from our client with respect to a

14   number for the Committee.  We have an accommodation, Your

15   Honor.  Before I discuss that, I want to just point one thing

16   out and that is, I don't know that in my presentation I made

17   clear enough.  There is a million dollar carve-out post-

18   termination date here for professionals.  So to the extent

19   the current termination date is contemplated to be April 28th,

20   and again, on that date, as Mr. Godshall indicated, he

21   believes there will be no further operations of the company

22   at that date.  We're talking about what it takes to file a

23   liquidating plan and move forward.  So, and again, if the

24   Committee is doing 50 percent of the work post-termination or

25   more, it needs to be understood that million dollar number is

1  available for them.  All of that said, Your Honor, RFC's

2  prepared to come up to - instead of a $300,000 number for the

3  Committee over the budget period, we're willing to come up to

4  a $500,000 number.  So, Your Honor, we - again, as I stated

5  in my presentation previously, we have no objection to a pot

6  plan in this case.  I understand that other professionals may

7  still or may not, I don't know the answer to that question.

8  But again, we tried to make an accommodation that we think is

9  reasonable given that there is - we're talking about 9 weeks

10  of fees in the case for the Committee or in the case of a pot

11  plan, 12 weeks for everybody.  Again, that gets to a $3 ½

12  millions of fees between the budgeted amount, the carve-out.

13        THE COURT: Okay.

14        MR. GODSHALL: Your Honor, may we have 30 seconds?

15        THE COURT: Okay.

16        MR. GODSHALL: Your Honor, the debtor's

17  professionals will agree to pot the fees with the inclusion

18  of the additional $200,000 for Committee professionals during

19  the budgeted period if that resolves this.  There is also -

20  and we'll wait to hear from Committee counsel whether with

21  that - they're okay with that concept.  I just noticed that

22  there's a mistake in the order that we gave Your Honor that

23  the language in this order is inconsistent with what Mr.

24  Lenhart just said, which is that if fees are above the budget

25  for the period prior to April 28th, they could get paid out of

1    that millions dollars after April 28th.  That's what Mr.

2    Lenhart just -

3          MR. LENHART: I'm sorry, may we have just one

4    minute?

5          MR. GODSHALL: Your Honor, if you look at the last

6    sentence on page 33 of the order.

7          THE COURT: Okay.

8          MR. GODSHALL: There's language that says the debtor

9    shall promptly cause to be paid from the escrow account

10   provisionally, et cetera, et cetera, fees to be paid pursuant

11   to order of the Court but in no event shall such payments

12   exceed the budgeted fees and disbursement allocable to such

13   professionals for the applicable time period.  I mean, as I

14   read that and as Committee counsel reads that, I'm sure if

15   the Committee's counsel exceeds the budgeted amount for the

16   period of time prior to April 28th, this language would seem

17   to suggest they can never be paid.  I believe that counsel

18   for RFC has now acknowledged that they can be paid from the

19   million dollars that's in the back end of the carve-out.

20         THE COURT: Now, is the million intended to be a

21   number to compensate people over and above the 1.9 and the

22   300 or 500?

23         MR. GODSHALL: There's $2.3 million in fees right

24   now that are budgeted to be incurred prior to April 28th.

25   That's now getting increased by $200,000 because the

1    Committee's piece is being increased.  So that's now 2.5

2    million.  The issue is, if those fees turn out to be more

3    than 2.5 million, and we know they will because the Committee

4    is going to spend more than that $500,000, can those fees in

5    excess of the 2.5 million be paid out of the million dollars

6    that comes into play on April 28th?  I thought I heard Mr.

7    Lenhart say at the podium that they could, which would

8    obviously be very important because we know the Committee's

9    fees are going to be more than what's in the budget.  So that

10   they have to be payable at some point or this just doesn't

11   work, and I'm saying that there needs to be a correction to

12   this language to deal with that, and with that correction,

13   the debtor's professionals are then agreeing to the pot with

14   the $200,000 increase that's just been proposed by RFC.

15           MR. LENHART: Thank you, Your Honor.  If I

16   understand what Mr. Godshall is proposing, it's simply that

17   if there are fees in the pre-April 28th period that exceed

18   what's in the budgeted amount, they can invade what is

19   effectively the post-termination date carve-out to pay those

20   fees, and it will reduce the carve-out at the same time, and

21   what will happen effectively in this case is because we have

22   the excess cashflow, a million dollar post-termination carve-

23   out will actually be escrowed and funded shortly within a

24   week, and so, if there's an excess of fees from the budgeted

25   amount, they'll pay it out of the million dollars; is that

1    what I'm understanding -

2              MR. GODSHALL: Yes.

3              MR. LENHART: - Mr. Godshall?  And it will reduce

4    the carve-out post -

5              MR. GODSHALL: Well, it doesn't - the carve-out will

6    be used for the purposes it was intended, to pay the fees.

7              MR. LENHART: Pay the fees.  It effectively allows

8    you to roll pre -

9              MR. GODSHALL: Yes.

10             MR. LENHART: We can agree to that.

11             MS. KELBON: Your Honor, I think that's acceptable

12   to the Committee as a fair resolution.  Your Honor, there are

13   a couple of typos in this order and glitches and maybe RFC

14   may consider them substantive but I thought they were more

15   just catching some changes, so I don't know how Your Honor

16   would like me to proceed on that.

17             MR. GODSHALL: Your Honor, we don't need to use cash

18   collateral in the next couple of days, so my suggestion would

19   be that we get the order cleaned up and then we'll submit it

20   to Your Honor under certification of counsel, and we can

21   proceed.

22             THE COURT: Okay.

23             MR. GODSHALL: It might be the next day or so.

24             THE COURT: Okay.

25             MS. KELBON: Thank you, Your Honor, we appreciate

1   your time.

2           THE COURT: Okay.  I appreciate the accommodation

3   made by RFC.   Actually, it's the number I had in mind.  We

4   stand in recess.

5           MR. GODSHALL: Thank you, Your Honor.

6           (Whereupon at 4:25 p.m., the hearing in this matter

7   was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18           I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                    March 23, 2007
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221