IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MORTGAGE LENDERS NETWORK USA, INC.,[1] | ) Case No. 07-10146 (PJW) |
| Debtor. | ) |
| | ) |
| | ) |

---

## DISCLOSURE STATEMENT IN RESPECT OF PLAN OF LIQUIDATION OF MORTGAGE LENDERS NETWORK USA, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

### IMPORTANT DATES

- Date by which Ballots must be received: _____, 2008 at 4:00 p.m.
- Date by which objections to Confirmation of the Plan must be filed and served: _____, 2008 at 4:00 p.m.
- Hearing on Confirmation of the Plan: _____, 2008 at _____ __.m.

/s/ Laura Davis Jones

Laura Davis Jones (Bar No. 2436)
Brad R. Godshall (CA Bar No. 105438)
Alan Kornfeld (CA Bar No. 130063)
Gillian N. Brown (CA Bar No. 205132)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)

Pachulski Stang Ziehl & Jones  LLP

Dated: March 12, 2008

---

[1] Debtor's EIN: XX-XXX7394
Debtor's Address:  Middlesex Corporate Center, 213 Court Street, 7th Floor, Middletown, CT  06457

## TABLE OF CONTENTS

**Page**

I. PREFATORY STATEMENT AND DEFINITIONS ................................................................. 1

II. INTRODUCTION AND OVERVIEW ................................................................................. 1

    A.   Introduction ................................................................................................................. 1

    B.   Disclaimers ................................................................................................................. 2

    C.   An Overview of the Chapter 11 Process ..................................................................... 3

    D.   Plan Overview ............................................................................................................. 3

        1.   Summary of Classification and Treatment of Claims and Interests under the Plan ........ 4

    E.   Voting on the Plan ....................................................................................................... 6

        1.   Who May Vote .................................................................................................... 6
        2.   How to Vote ........................................................................................................ 6

    F.   Confirmation of the Plan ............................................................................................. 7

        1.   Generally ............................................................................................................ 7
        2.   Objections to Confirmation ................................................................................ 7
        3.   Hearing on Confirmation ................................................................................... 8

III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR ............................... 8

    A.   Overview of the Debtor and its Operations ................................................................ 8

        1.   Introduction ........................................................................................................ 8
        2.   Business Operations ........................................................................................... 9
        3.   Financing and Significant Indebtedness ........................................................... 11
        4.   Circumstances Leading to the Commencement of the Chapter 11 Case ........... 12
        5.   The Filing of the Chapter 11 Case and the Debtor's Bankruptcy Goals ........... 14

    B.   The Commencement of the Chapter 11 Case ............................................................ 15

    C.   First Day Motions and Other Relief .......................................................................... 15

        1.   Employees ......................................................................................................... 15
        2.   Cash Management ............................................................................................. 16
        3.   Taxes ................................................................................................................ 16
        4.   Utilities ............................................................................................................. 17
        5.   Interim Compensation for Professionals ........................................................... 17
        6.   Lease Rejection ................................................................................................. 17
        7.   Rejection Of Executory Contracts .................................................................... 18
        8.   Sale of Loans .................................................................................................... 18
        9.   Retention of Key Professionals ......................................................................... 19
        10.  Ordinary Course Professionals ......................................................................... 19
        11.  Cash Collateral Use And DIP Financing .......................................................... 20

    D.   Appointment of Committee ....................................................................................... 20

E.  Bar Date for Filing Proofs of Claim .......................................................... 20

F.  Filing of Statements and Schedules .......................................................... 20

G.  Other Postpetition Activities ................................................................... 21

H.  Significant Postpetition Litigation ........................................................... 22

IV. DESCRIPTION OF THE PLAN ....................................................................... 22

V. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES AND PRIORITY TAX CLAIMS 22

A.  Introduction ............................................................................................. 22

1.  Administrative Claims ...................................................................... 23

B.  Professional Fees ..................................................................................... 23

C.  Priority Tax Claims .................................................................................. 24

VI. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY
INTERESTS ...................................................................................................... 24

A.  Summary .................................................................................................. 24

B.  Classification and Treatment of Claims against the Debtor ............................. 25

1.  Class 1 – Priority Claims ................................................................. 25
2.  Class 2 – Secured Claims ................................................................. 25
3.  Class 3 – Unsecured Claims ............................................................. 26
4.  Class 4 – Subordinated Claims ......................................................... 26
5.  Class 5 – Equity Interests ................................................................. 26

VII. ACCEPTANCE OR REJECTION OF THE PLAN ......................................... 27

A.  Voting Classes ......................................................................................... 27

B.  Acceptance by Impaired Classes .............................................................. 27

C.  Presumed Acceptance/Rejection of Plan .................................................. 27

D.  Nonconsensual Confirmation ................................................................... 27

E.  How to Vote ............................................................................................. 28

VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ................................... 28

A.  Available Cash. ........................................................................................ 28

B.  Handling of Plan Assets and Collection of Plan Proceeds. ...................... 29

C.  Litigation. ................................................................................................ 29

D.  Payment of Plan Expenses. ...................................................................... 29

E.  Distribution of Plan Proceeds. ................................................................. 29

F.  Post-Confirmation Operations of the Liquidating Debtor. ...................... 30

G.  Power and Authority of Responsible Officer ........................................... 30

H.  Liquidation and Dissolution of the Liquidating Debtor ........................... 31

I.     Full and Final Satisfaction. ........................................................................... 31
J.     Distribution Procedures. ............................................................................. 31
K.     Disbursing Agent. ....................................................................................... 32
L.     Claims Reserve Account. ............................................................................ 32
M.     Resolution of Disputed Claims. .................................................................. 32
N.     Reserve Provisions for Disputed Claims. .................................................... 33
O.     Allocation of Distributions. ........................................................................ 34
P.     Rounding. .................................................................................................... 34
Q.     No Interim Cash Payments of $50 or Less on Account of Allowed Claims. ................. 35
R.     Disputed Payments. ..................................................................................... 35
S.     Unclaimed Property. ................................................................................... 35
T.     Setoffs. ........................................................................................................ 35
U.     No Distributions on Late-Filed Claims. ...................................................... 35
V.     Withholding Taxes. ..................................................................................... 36
W.     De Minimis Distributions; Charitable Donation. ........................................ 36
X.     Issuance of New Common Stock. ................................................................ 36
Y.     United States Trustee Fees. ......................................................................... 36

**IX.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 36
A.     Rejection of Executory Contracts and Unexpired Leases. ........................... 36
B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ....... 37

**X.** CONDITIONS PRECEDENT TO CONFIRMATION  OF THE PLAN AND TO THE
       EFFECTIVE DATE. ............................................................................................ 37
A.     Conditions to Confirmation of the Plan. ..................................................... 37
B.     Effect of Failure of Conditions to Confirmation. ........................................ 37
C.     Effective Date. ............................................................................................ 37

**XI.** EFFECTS OF CONFIRMATION ........................................................................... 37
A.     Binding Effect of Plan. ............................................................................... 37
B.     Revesting of Property of Debtor. ................................................................ 38
C.     Property Free and Clear. ............................................................................ 38
D.     Limitation of Liability. ............................................................................... 38
E.     Releases. ..................................................................................................... 38
       1.   Debtor's Release. .............................................................................. 39
       2.   Other Releases. ................................................................................. 39

F.   Injunction. ........................................................................................................ 40

G.   Post-Confirmation Liability of Responsible Officer and Disbursing Agent. .................. 40

H.   Insurance. ........................................................................................................ 41

**XII.** RETENTION OF JURISDICTION ...................................................................... 41

**XIII.** MISCELLANEOUS ............................................................................................ 42

A.   Revocation of Plan of Reorganization. .............................................................. 42

B.   Severability of Plan Provisions. ........................................................................ 42

C.   Governing Law. ............................................................................................... 42

D.   Exhibits. .......................................................................................................... 43

E.   Notices. ........................................................................................................... 43

F.   Reservation of Rights. ..................................................................................... 43

G.   Computation of Time Periods. .......................................................................... 44

H.   Defects, Omissions and Amendments. .............................................................. 44

I.   Filing of Additional Documents. ....................................................................... 44

J.   Successors and Assigns. ................................................................................... 44

K.   Setoffs and Recoupments. ................................................................................ 44

L.   Securities Exemption. ...................................................................................... 45

M.   Plan Interest Rate. ........................................................................................... 45

N.   Implementation. ............................................................................................... 45

O.   Record Date. .................................................................................................... 45

P.   Certain Actions. ............................................................................................... 45

Q.   Dissolution of Committee. ................................................................................ 46

R.   Waiver of Ten (10) Day Stay. ........................................................................... 46

S.   Substantial Consummation. .............................................................................. 46

**XIV.** SUMMARY OF DISTRIBUTABLE ASSETS ..................................................... 46

A.   Non-Litigation Assets ...................................................................................... 46

B.   Litigation ........................................................................................................ 46

**XV.** RISK FACTORS ................................................................................................ 47

**XVI.** BEST INTEREST OF CREDITORS TEST .......................................................... 47

A.   Chapter 7 ......................................................................................................... 47

B.   Liquidation Analysis ........................................................................................ 48

**XVII.** CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 49

A.   Consequences to Debtor ................................................................................... 49

B.    Federal Income Tax Treatment of Creditor Fund ............................................................ 50

    1.    Classification of Creditor Fund .................................................................... 50
    2.    Tax Reporting ............................................................................................ 50

C.    Consequence to Holders of Claims .................................................................................. 50

    1.    Holders of Claims ...................................................................................... 51
    2.    Distributions in Discharge of Accrued but Unpaid Interest ........................... 51
    3.    Character of Gain or Loss; Tax Basis; Holding Period ................................. 52

D.    Consequences to Holders of Interests ............................................................................. 52

E.    Withholding .................................................................................................................. 52

**XVIII.** CONCLUSION ................................................................................................................ 54

## I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code"), Mortgage Lenders Network USA, Inc. ("MLN" or the "Debtor"), the debtor and debtor in possession in the above-captioned case, hereby submits this disclosure statement (the "Disclosure Statement") in support of the Plan Of Liquidation Of Mortgage Lenders Network USA, Inc. Under Chapter 11 Of The Bankruptcy Code (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article I of the Plan shall also apply to capitalized terms used herein that are not otherwise defined.

## II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On February 5, 2007 (the "Petition Date"), the Debtor commenced the above-referenced bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. ·

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtor. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of and pending litigation of and against the Debtor; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtor strongly urges you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On _____, 2008, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtor urges

you to accept the Plan by completing and returning the enclosed ballot(s) no later than
_____, 2008, at 4:00 p.m. Eastern Time.

## B.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR
UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.
PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE
STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN
SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE
NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S
BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE
INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT
CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  SEE 11
U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT
SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY
SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE
DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL
CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR
OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY
REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR
REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS
DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING
AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE
INDICATED, IS UNAUDITED.  MOREOVER, BECAUSE OF THE DEBTOR'S FINANCIAL
DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S FINANCIAL
MATTERS, THE BOOKS AND RECORDS OF THE DEBTOR, UPON WHICH THIS
DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR
INACCURATE.  HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE
THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLC ("PSZ&J") IS GENERAL
INSOLVENCY COUNSEL TO THE DEBTOR.  PSZ&J HAS RELIED UPON
INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION
OF THIS DISCLOSURE STATEMENT.  ALTHOUGH PSZ&J HAS PERFORMED CERTAIN
LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS
DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL
OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE
CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR

2

INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.   An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in the Chapter 11 Case), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a Debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One official committee has been appointed in this Chapter 11 Case, which represents the collective interests of general unsecured creditors (the "Committee").

A Chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Plan. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Debtor's Plan are summarized below.

## D.   Plan Overview

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation and provides for the distribution of the proceeds from the Debtor's liquidation of its remaining assets (as discussed below).

The Plan provides for the classification and treatment of Claims against and Interests in the Debtor. For classification and treatment of claims against and equity interests in each Debtor, the Plan designates four (4) Classes of Claims and one (1) Class of Interests. These classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. Pursuant to the Plan, the Debtor will

3

ultimately be dissolved and all existing interests in the Debtor (including all issued and outstanding preferred and common stock) will be extinguished and cancelled.

1.    **Summary of Classification and Treatment of Claims and Interests under the Plan**

The following chart[2] briefly summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated. Actual Claims and Distributions will vary depending upon, among other things, the outcome of objections to Claims, recoveries on Preserved Avoidance Actions and whether the Bankruptcy Court approves the Creditor Settlement.

a.    Unclassified Claims

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims<br><br>Estimated Recovery: 100% | $100,000 | The Liquidating Debtor shall pay each Holder of an Allowed Administrative Claim in full in the amount of its Allowed Claim from the Administrative Claims/Priority Claims Account, without interest, in Cash promptly after the date the Claim becomes an Allowed Claim. The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder of an Allowed Administrative Claim, the Liquidating Debtor and the Agent. |
| N/A | Priority Tax Claims<br><br>Estimated Recovery: 100% | $300,000 | On the later to occur of (i) the Effective Date or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtor shall pay to each Holder of an Allowed Priority Tax Claim such Allowed Priority Tax Claim without interest from the funds in the Tax Account. |
| N/A | Professional Fee Claims<br><br>Estimated Recovery: 100% | $700,000 | The Liquidating Debtor shall pay Professionals from the Professional Fees Account all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date plus post-Effective Date fees. |

---

[2]        This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

58302-001\DOCS_LA:179959.9

b.    Classified Claims

| 1 | Priority Claims<br>Estimated Recovery: 100% | $3,800,000 | Classification: Class 1 consists of the Priority Claims against the Debtor. The Liquidating Debtor shall pay from the Net Plan Proceeds the Allowed amount of each Class 1 Priority Claim to each Entity holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Debtor shall pay each Entity holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; provided, however, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. Class 1 is an Impaired Class and Holders of Class 1 Claims are entitled to vote on the Plan. |
|---|---|---|---|
| 2 | Secured Claims (If Any)<br>Estimated Recovery: 100% | $0.00 | Class 2 consists of any Secured Claims. Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan. To the extent any Secured Claims exist, at the option of the Debtor or Liquidating Debtor, as applicable, (i) each Holder (if any) of an Allowed Class 2(B) Claim shall receive on the Effective Date or as soon thereafter as practicable the proceeds from any sale of the collateral securing such Claim in an amount equal to the value of the Creditor's interest in the collateral securing such Claim in full and complete satisfaction of such Claim, or (ii) the collateral securing such Creditor's Claim shall be abandoned to such Creditor, in full and complete satisfaction of such Claim. Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote on the Plan. |
| 3 | Unsecured Claims<br>Estimated Recovery: 1-15% | $600,000,000 | Each Holder of an Allowed Unsecured Claim against MLN shall receive a Pro Rata share of the Net Plan Proceeds, as determined by the Liquidating Debtors. Class 3 is an Impaired Class and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. |
| 4 | Subordinated Claims<br>Estimated Recovery: 0% | $0.00 | On the Effective Date, Subordinated Claims shall not receive or retain any Distribution or property on account of such Subordinated Claims under the Plan. |

58302-001\DOCS_LA:179959.9

| | | | |
|---|---|---|---|
| | | | Holders of Class 4 Claims shall receive no Distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Class 4 Creditors are not entitled to vote. |
| 5 | Equity Interests<br>Estimated Recovery: 0% | $0.00 | There shall be no Distribution made on account of Class 5 Equity Interests. After the entry of the Effective Date, the Equity Interests will be canceled and will cease to exist. Class 5 Equity Interests will receive no Distribution under the Plan and are, therefore, deemed to have rejected the Plan. Accordingly, Class 5 Equity Interests are not entitled to vote. |

## E.   Voting on the Plan

### 1.   Who May Vote

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is impaired if legal, equitable or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote. Class 2 is unimpaired and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote under the Plan. Classes 4 and 5 receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Accordingly, only Classes 1 and 3 are impaired and entitled to vote to accept or reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

### 2.   How to Vote

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1 and 3 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives Holders of Class 1 and 3 Claims one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. The Trumbull Group, LLC, d/b/a Wells Fargo Trumbull ("Trumbull"), as the Voting Tabulator and Balloting Agent, will count the Ballots.

58302-001\DOCS_LA:179959.9

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE DEBTOR'S BALLOTING AGENT, TRUMBULL, NO LATER THAN 4:00 P.M. EASTERN TIME ON _____, 2008 AT THE FOLLOWING ADDRESS:

The Trumbull Group
45 Broadway, 14th Floor
New York, NY  10006
Attn:  Ronda K. Collum, Vice President

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE.  FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

**F.**     **Confirmation of the Plan**

    **1.**     **Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article VI below.

    **2.**     **Objections to Confirmation**

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for Debtor and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.  Bankruptcy Rule 3007 governs the form of any such objection.

Counsel on whom objections must be served are:

> Counsel for the Debtor
> Laura Davis Jones
> James E. O'Neill
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market St., 16th Floor
> Wilmington, DE  19801
>
> Brad R. Godshall
> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 11th Floor
> Los Angeles, CA 90067

7

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

3.    **Hearing on Confirmation**

The Court has set _____, 2008 at _____ __.m. for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 2, Wilmington, DE 19801, before the Honorable Peter J. Walsh, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## III.

## HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR

A.    **Overview of the Debtor and its Operations**

1.    **Introduction**

The Debtor is a privately held Delaware corporation that was founded approximately 10 years ago with seven employees. Thereafter, the Debtor grew into a full service residential mortgage company licensed to do business in fifty states and the District of Columbia. As of November, 2006, the Debtor employed approximately 1,780 employees across the nation who, depending upon their location, worked at the Debtor's: (i) corporate headquarters, in Middletown, Connecticut; (ii) 5 regional, sub-prime wholesale origination offices throughout the country; (iii) 1 prime wholesale origination office in Connecticut; (iv) two retail origination offices in Connecticut and Illinois; and/or (v) two loan servicing locations in Arizona and Connecticut. At the close of 2006, the Debtor's monthly loan volume was approximately $1.5 billion; and the Debtor was servicing approximately $17 billion of sub-prime and prime mortgages.

A majority of the Debtor's business involved the origination of wholesale loans to credit-impaired borrowers (frequently referred to as "sub-prime") who generally are unable to obtain financing from traditional banks or savings and loan associations. The Debtor was the fifteenth largest sub-prime lender in the United States in the third quarter of 2006, with $3.3 billion in loan originations for that quarter.

As explained in detail below, a significant increase in the number of early payment defaults occurred in the sub-prime market in the last quarter of 2006. In an attempt to abate such defaults on its future loan originations, the Debtor tightened its lending standards and introduced a new loan product. Unfortunately, there was a significant mistake in the pricing of the new loan product. As a result of this pricing error, the Debtor originated $600 to $700 million of new loans that, inadvertently, could only be sold for a loss in the secondary markets. As the Debtor

was trying to work through these issues at the end of 2006 and the start of 2007, certain of its warehouse lenders declined to advance amounts in excess of their commitments and/or began terminating the financing used for loan origination. This, among other things, prevented the Debtor from funding a number of loan commitments upon which it had closed, and forced the Debtor to shut down its wholesale loan origination business.

While the Debtor was trying to address these problems and salvage its loan origination business, a $7.65 million judgment was issued against it on January 17, 2007 in favor of Wachovia Bank, National Association in the Southern District of New York and entered on the docket on January 22, 2007. Moreover, on January 19, 2007, the State of Connecticut Department of Banking issued a Cease and Desist Order (defined below), pursuant to which the Debtor was, among other things, ordered to stop making further loans. Finally, on January 24, 2007, Freddie Mac sent the Debtor a termination letter, pursuant to which Freddie Mac purportedly terminated the Debtor as servicer of its loans.

These events in late January, 2007, effectively foreclosed any possibility for the Debtor to salvage its loan origination business, and forced the Debtor to seek bankruptcy protection by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 5, 2007 (the "Petition Date").

## 2.    Business Operations

Prior to December 29, 2006, the Debtor had three major components to its business: (1) wholesale loan originations; (2) retail loan originations; and (3) loan servicing.

### a.    Wholesale Loan Originations.

Prior to December 29, 2006, the largest component of the Debtor's business was its wholesale loan originations, wherein the Debtor worked with a network of independent mortgage brokers to provide financing for consumer borrowers on residential loans. The Debtor originated prime wholesale loans to consumer borrowers in compliance with Fannie Mae and Freddie Mac guidelines, and sub-prime wholesale loans to consumer borrowers who were unable to qualify for prime lending on residential mortgages. The Debtor obtained the funds needed for its loan originations from several warehouse lines of credit (the "Warehouse Credit Facilities") provided by Residential Funding Company, LLC ("RFC"), Greenwich Capital Financial Products, Inc. ("Greenwich"), Merrill Lynch Bank USA and Merrill Lynch Mortgage Capital, Inc. (collectively, "Merrill Lynch"), and Goldman Sachs Mortgage Co. ("Goldman") – and collectively referred to as the "Warehouse Lenders"). After originating wholesale loans, the Debtor then sold substantially all of such loans to its Warehouse Lenders and/or certain other third parties, including Freddie Mac, Fannie Mae, Countrywide Home Loans, Inc., Credit-Based Asset Servicing and Securitization LLC, Emax Financial Group LLC ("Emax"), and Lehman Brothers Bank, FSB ("Lehman") (collectively, the "Loan Purchasers"). Certain of these Loan Purchasers would bundle the purchased loans and issue securities (through bankruptcy remote entities), backed by these loans and mortgages to private investors.

The Debtor sold loans pursuant to certain guidelines with customary representations and warranties set forth in the sale contracts to the Loan Purchasers. Pursuant to such sale contracts,

the Debtor may be required to repurchase loans or reimburse Loan Purchasers for a breach of a representation or warranty. In addition, the Debtor may be required to return a portion of the premium earned if a loan is prepaid during a limited period of time after sale, usually six to twelve months. The Debtor may also be required to repurchase loans ("Repurchase Requests") if a default occurs within a brief period following the loan sale transfer date ("Early Payment Defaults"), or if loans are alleged to contain misrepresentations by borrowers.

        b.     Retail Loan Originations.

In addition to originating wholesale loans through mortgage brokers, the Debtor also originated loans directly to consumers through 4 different programs, until approximately January 19, 2007. First, the Debtor made direct loans to consumers. To generate these loans, the Debtor purchased leads from information providers and then interacted directly with the potential borrowers to originate the loans. Second, the Debtor originated loans to consumer borrowers seeking to refinance existing loans. As described below, the Debtor's business also involves servicing a significant number of the loans. When individuals whose loans were being serviced by the Debtor sought to refinance, they were referred to the Debtor's Portfolio Retention Group for refinancing. Third, the Debtor originated loans to consumer borrowers through its Bank Referral Group. The Debtor's Bank Referral Group consists of a network of banks located throughout the Northeast with which the Debtor regularly conducted business. When these banks received loan applications from consumer borrowers who were unable to meet the bank's lending requirements, the banks would refer such individuals to the Debtor. If the individual satisfied the Debtor's lending requirements, then the referring bank would make the loan to the individual and the Debtor would purchase the loan from the referring bank. Finally, the Debtor originated loans to consumer borrowers through the use of its Mortgage Affinity Program. In this program, Debtor sought out companies, usually with more than 5,000 employees, with which to enter into agreements pursuant to which the Debtor would offer competitively priced loans to such company's employees in exchange for the company's promotion of the Debtor's services as an employee benefit.

        c.     Loan Servicing.

Finally, the Debtor provides loan servicing on an interim and full time basis to certain Loan Purchasers for a significant number of loans originated by the Debtor. As of December 31, 2006, the Debtor serviced approximately $19.2 billion of loans. As of January 31, 2007, the Debtor serviced approximately $14 billion of loans. The Debtor also has a small number of its own loans that it services as well. Typical loan services provided by the Debtor include, without limitation: billing; collections; processing mortgage payments and loan payoffs received from borrowers; remitting payments to the appropriate entities; processing tax and insurance payments received from borrowers and remitting such funds to the appropriate taxing authorities and insurers; maintaining records; engaging in collection efforts; foreclosing on delinquent loans; and performing accounting and reporting services.

The Debtor provided servicing to Emax Financial Group, LLC ("Emax") through a sub-servicing arrangement. Emax is a Virgin Island LLC that is an affiliate of the Debtor. Emax purchased loans and also sold loans to investors, while retaining the servicing rights. The Debtor provided sub-servicing (i.e. the actual servicing for such loans) pursuant to the terms of a sub-

servicing agreement between the Debtor and Emax.  Prior to the Petition Date, Emax's servicing rights, and the Debtor's sub-servicing rights with respect thereto, purportedly were terminated.

3.  **Financing and Significant Indebtedness**

a.  Institutional Debt.

The Debtor's wholesale and retail loan origination business was primarily financed through the Warehouse Credit Facilities provided by RFC, Merrill Lynch, Greenwich and Goldman (i.e. the Warehouse Lenders).  The Warehouse Lenders would make advances to the Debtor, who in turn would use such funds to originate loans.  The funds advanced by the Warehouse Lenders were secured by the mortgages from the borrowers.  In some instances, these Warehouse Facilities were styled as "repurchase agreements" rather than as loan agreements. This styling had no practical impact on how the Debtor administered its business.

The Debtor employed both "wet" and "dry" funding to finance its loan originations.  Wet funding occurs when a lender advances money to fund loans prior to receiving the collateral package (i.e. executed loan agreement, note, mortgage and deed) securing such loans.  Dry funding occurs when a lender advances money after receiving the full collateral package securing the loan.  The Debtor obtained wet financing from its Warehouse Credit Facilities with RFC, pursuant to a $529 million line, and Merrill Lynch, pursuant to a $1.7 billion line.  As the Debtor approached its maximum lending capacities on its RFC and Merrill Lynch lines, it would sweep certain of the loans on those lines to Greenwich and Goldman, in order to increase its wet funding availability.  The Debtor would do so by sending Greenwich and/or Goldman a list of loans that had initially been wet funded and for which the collateral packages had been obtained. Greenwich and/or Goldman would then review such loans and, if they so desired, fund the loans by transferring the requisite funds to RFC and/or Merrill Lynch in exchange for having the collateral packages for such loans shipped to their respective custodian facilities.

For the reasons set forth below, the Debtor's ability to obtain financing from its Warehouse Lenders for originating wholesale loans ceased prior to the Petition Date.  In addition, all of the Warehouse Lenders, except for RFC, purchased all of the loans on their respective credit lines from the Debtor.  The Debtor believed it owed estimated deficiency amounts of $1.3 million to Greenwich, $344,000 to Goldman, and $17.8 million to Merrill Lynch as of the Petition Date.

In addition to its Warehouse Credit Facilities, the Debtor obtained secured financing from IXIS Real Estate, Inc. ("IXIS") and Merrill Lynch.  The Debtor's financing from IXIS was secured by the Debtor's interest in its Freddie Mac servicing rights, while the Debtor's non-Warehouse financing from Merrill Lynch was secured by the Debtor's Fannie Mae servicing rights.  As of the Petition Date, the Debtor owed IXIS approximately $25 million and Merrill Lynch approximately $9.4 million.  On January 24, 2007, as set forth in detail below, Freddie Mac sent a notice of termination with respect to the Debtor's servicing rights purportedly terminating such rights.

The Debtor also obtained additional financing from RFC to fund its operating expenses. As of the Petition Date, the Debtor owed RFC approximately:  (i) $20 million on account of a

11

senior capital working line of credit; and (ii) approximately $4.9 million on account of a premium advance line of credit.

Finally, the Debtor owed RFC $1.5 million on account of that certain Amended and Restated Loan Agreement (Convertible Debt) Between the Debtor and RFC, dated as of May 21, 2004 (the "Agreement").

As of March 5, 2008, the Warehouse Lenders filed proof of claims asserting unsecured claims against MLN as follows:

| | |
|---|---|
| Merrill Lynch Mortgage Capital: | $24,595,325.00 |
| Merrill Lynch Mortgage Lending Inc.: | $56,690,132.00 |
| Greenwich Capital Finance: | $25,661,624.00 |
| RFC: | $495,766,953.00 |
| Goldman Sachs Mortgage Co.: | $4,710,454.00 |

The Debtors have not yet undertaken an analysis of the merits of these asserted claims filed by the Warehouse Lenders.

      b.    Trade and Employee Obligations

The Debtor had the following estimated trade and employee obligations as of the Petition Date:

| | |
|---|---|
| Trade Obligations: | $33.1 million including judgments |
| Employee Obligations: | $3.8 million in priority claims and an additional $6.4 million in non-priority claims. |

Filed employee Claims exceed Debtor's estimates materially: $10.7 million in such Claims have been filed, including $6.9 million asserted as priority claims. Debtor believes the priority claims filed materially overstate that portion of such Claims that is entitled to priority status under the law.

**4.**    **Circumstances Leading to the Commencement of the Chapter 11 Case**

In the last quarter of 2006 and in January, 2007, the Debtor experienced multiple, unforeseen crises that forced the Debtor to file for bankruptcy protection. These crises, set forth in detail below, included a significant increase in Early Payment Defaults in the sub-prime market, and a corresponding increase in the number of Repurchase Requests submitted to the Debtor, a significant mistake by the Debtor in the pricing of a new loan product, a collapse in the funding to the Debtor needed to originate loans, the entry of a major judgment against the

Debtor, the closure of the Debtor's wholesale and retail loan origination businesses, and a substantial loss of servicing in the Debtor's servicing business.

a.    Increase in Early Payment Defaults.

In 2006, the Debtor commenced selling loans to Wall Street firms (i.e. "Loan Purchasers"). Pursuant to the terms of these sales, the Loan Purchasers could, in certain circumstances set forth in the sale contracts, submit Repurchase Requests to the Debtor in the event that there were Early Payment Defaults on the purchased loans. Starting in June, 2006, in conjunction with rising interest rates and fuel costs, the sub-prime market experienced a substantial increase in the number of Early Payment Defaults as more consumer borrowers defaulted on their loans. As Early Payment Default rates increased, the Debtor had to expend cash in order to "buy back" the increasing number of loans that were subject to Repurchase Requests.

b.    The A++ Loan Crisis.

To understand the cause of the increase in Early Payment Defaults, the Debtor performed an analysis and found 15 underwriting characteristics that needed to be eliminated to help reduce such defaults. Since this tightening of lending standards would cause a decrease in the number of loans that the Debtor would generate, the Debtor introduced a new, fixed-rate A-plus-plus product (the "A++ Loans") in the fourth quarter of 2006. The A++ Loans could be originated at rates that were competitive with loans conforming with Fannie Mae and Freddie Mac guidelines, and required borrowers to have a FICO score of 730, which was higher than the FICO requirements for the other loan products. The new loans proved more popular than anticipated and the Debtor received a massive influx of approvals on A++ Loans. However, within 13 days after the rollout of the A++ Loans, the Debtor realized that the algorithm used to price the A++ Loans had a mistake in it causing the rates to fall below market rates, and that the Debtor would take a loss on each loan when the loans were sold in the secondary market.

Upon realizing the pricing error, the Debtor immediately attempted to cease the sale of A++ Loans and believed that its exposure on the A++ Loans would be approximately $200 to $300 million of origination volume. The anticipated loss on that volume of $3 to $4 million was an amount that the Debtor had capital to absorb. Accordingly, the Debtor decided that the existing loans should be honored and instructed its employees to immediately stop selling the A++ Loans while agreeing to consider applications already received as long as closings took place within 30 days. Notwithstanding these efforts, an additional $400 million of the A++ Loans were accepted by wholesale business line management.

c.    The Funding Crisis.

Contemporaneously with the Debtor's problems with the A++ Loans, in early December, two other subprime lenders – Ownit Mortgage Solutions, Inc. ("Ownit"), and Sebring Capital Partners LLC ("Sebring") – went out of business. When the Debtor reported the pricing problem for the A++ Loans to its Warehouse Lenders (at about the same time as the news of the Ownit and Sebring failures was reverberating through the market), the Warehouse Lenders significantly lowered their advance rates on the funds used by the Debtor to originate loans. This lowering of

13

advance rates, in turn, required the Debtor to post additional collateral as security for such funds. When the Debtor was unable to do so, its financing ceased when RFC declined to advance amounts in excess of its commitment, and Merrill Lynch declined to advance against its line unless RFC made half the advances for that day. This forced the Debtor to shut down (the "Wholesale Shut Down") its wholesale loan originations on December 29, 2006.

At the time of the Wholesale Shut Down, the Debtor had a number of outstanding loan commitments that had been closed, but not funded. Although the Debtor was able to fund certain of these loan commitments through placement with other entities, not all of the loan commitments were funded.

       d.     <u>The Regulatory Crisis.</u>

Since the Debtor was unable to obtain the financing necessary to fund the above-noted, outstanding loans, the State of Connecticut Department of Banking issued a Temporary Order to Cease and Desist against the Debtor on January 19, 2007 (the "Cease and Desist Order"). On or about the same time, additional Cease and Desist Orders were received by the Debtor from Massachusetts, Vermont, Rhode Island, Pennsylvania, New Hampshire, New York, Michigan, and Maine. Pursuant to the Cease and Desist Orders, the Debtor was ordered, among other things, to stop further lending activity and to obtain replacement funding for the unfunded loan commitments.

Pursuant to the Cease and Desist Orders, the Debtor stopped its retail lending activities (the "Retail Shut Down") and RFC stopped financing the Debtor's retail loan originations. At the time of the Retail Shut Down, the Debtor had retail loan commitments upon which it had closed, but not funded.

       e.     <u>Impact on Servicing.</u>

On January 24, 2007, Freddie Mac sent the Debtor a termination letter, pursuant to which Freddie Mac purportedly terminated its servicing agreement with the Debtor. In addition, certain other entities for which the Debtor provides loan servicing have purportedly terminated such services or advised the Debtor of their intentions to do so at a future date certain.

The Wachovia Judgment. In addition to the foregoing, on January 17, 2007, in the United States District Court for the Southern District of New York, a judgment in the amount of $7.65 million was issued against the Debtor in favor of Wachovia Bank, National Association ("Wachovia"), in the action entitled Wachovia Bank, National Association, f/k/a First Union National Bank v. Mortgage Lenders Network USA, Inc., Case No. 03 Civ. 8809 (NRB) and was entered on January 22, 2007.

    **5.**      **The Filing of the Chapter 11 Case and the Debtor's Bankruptcy Goals**

The confluence of the above-noted crises severely impacted the Debtor's business. As of the Petition Date, the Debtor has essentially ceased operations at its prime and sub-prime wholesale origination offices, was in the process of rapidly phasing out operations at its retail origination offices, and was in the process of scaling back its servicing business. As of the Petition Date, the Debtor had approximately 267 employees who were employed at the head

14

office in Middleton, Connecticut and at the Debtor's loan servicing operations in Wallingford, Connecticut. These employees continued to run the Debtor's remaining loan servicing business.

The Debtor filed its Chapter 11 Case in order to preserve its remaining assets from dismemberment by individual creditors, so that their value may be maximized by the Debtor for the benefit of all of its creditors.

**B.      The Commencement of the Chapter 11 Case**

In order to liquidate in an orderly manner, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on February 5, 2007. No trustee or examiner has been appointed in the Chapter 11 Case. The Committee was appointed on February 21, 2007 to represent the interests of Debtor's general unsecured creditors. The Debtor continued to operate as Debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.

**C.      First Day Motions and Other Relief**

On the Petition Date, the Debtor sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtor filed simultaneously with, or around the same time as, its voluntary petition. The Debtor sought this relief to minimize disruption of the Debtor's business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Case regarding the administration of the Chapter 11 Case and interim compensation for Estate professionals, and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Case addressed the following issues, among others:

**1.      Employees**

On the Petition Date, the Debtor filed its *Motion Pursuant to Bankruptcy Code Sections 105(a), 363 and 507(a) for an Order Authorizing the Debtor to (I) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Benefits Programs and Pay Related Administrative Obligations; and (IV) Authorize Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests (the "Wages Motion").*

As of the Petition Date, the Debtor employed 267 full and part time employees in hourly, salaried, supervisory, management and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtor's operations (collectively, the "Employees"). Approximately 154 Employees were paid hourly and approximately 113 Employees were salaried. To minimize the personal hardships the Employees would suffer if prepetition employee-related obligations were not paid when due or honored as expected, and to maintain the morale of the Employees during this critical time, the Debtor, by the Wages Motion, sought authority, in its discretion, to pay and/or honor, as the case may be, certain prepetition claims for, among other items, wages, salaries, and other compensation solely for continuing Employees, as well as to honor paid time off, fixed holidays, medical benefits, contributions to employee benefit plans, and other employee benefits offered by the Debtor for employees that

15

the Debtor historically had paid in the ordinary course of its business, to reimburse certain reimbursable unpaid employee reimbursement obligations solely for continuing Employees, and to pay all costs incident to the foregoing.

On February 7, 2008, the Court entered its order authorizing the payment of certain prepetition employees related claims and the continuation of certain employee benefits postpetition [Docket No. 40]. Supplemental Orders were entered on the Wages Motion on February 28, 2007 [Docket No. 174] and March 1, 2007 [Docket 190].

## 2.    **Cash Management**

On the Petition Date, the Debtor filed its *Motion for Order Under 11 U.S.C. Sections 105, 345, 363, 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, and (IV) Limited Waiver of Section 345(b) Deposit and Investment Requirements.*

Prior to the commencement of the Chapter 11 Case, the Debtor, in the ordinary course of its business, maintained various bank accounts from which it managed its cash receipts and disbursements. The Debtor's cash management system is an integrated network of bank accounts that facilitates the timely and efficient collection, management and disbursement of funds used by the Debtor in its business. Because of the nature of the Debtor's loan servicing business, the massive disruption to the Debtor's business if it had been forced to close the accounts that comprise the cash management system and the approximately two months it would take the Debtor to open a new cash management system, it was critical that the existing Cash Management System remain in place. Absent an immediate order from the Court at the commencement of the Chapter 11 Case, the Debtor faced the risk of the suspension of its cash management system. The Debtor also needed authority to maintain existing bank accounts and business forms in order to minimize disruptions and make the transition to chapter 11 smoother and more orderly. The Debtor further requested that it be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code, requiring certain deposit or investment procedures. The Court entered its interim order granting the relief requested by the Debtor in respect of its cash management system and related relief on February 7, 2007 [Docket No. 41] and a final order on February 28, 2008 [Docket No. 171].

## 3.    **Taxes**

On the Petition Date, the Debtor filed its *Motion of the Debtor for an Order (I) Authorizing the Debtor to Pay Prepetition Sales and Use, Franchise and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.*

In connection with the normal operation of its business, the Debtor pays an assortment of sales and use, business and occupations, gross receipts, business privilege and similar taxes (the "Taxes") to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities") and pays various regulatory fees ("Regulatory Fees") to federal, state, and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities").

58302-001\DOCS_LA:179959.9

By this Motion, the Debtor sought authority to pay, in the Debtor's sole discretion, prepetition Taxes and Regulatory Fees owed to the Taxing and Regulatory Authorities, including, without limitation, Taxes and Regulatory Fees subsequently determined upon audit to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $100,000. The Court granted the Debtor such authority by order entered on February 7, 2007 [Docket No. 37].

### 4.    Utilities

On the Petition Date, the Debtor filed its *Motion of the Debtor for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment.*

In the normal course of business, the Debtor has relationships with various utility companies and other providers for the provision of telephone, gas, electricity and related services.   Inasmuch as the Debtor did business with many utilities, it was imperative that "additional assurance" procedures be established for efficient administration of the Debtor's responsibilities under section 366 of the Bankruptcy Code.  On February 7, 2007, the Court entered its interim order implementing the procedures proposed by the Debtor to ensure adequate assurance of future payment to utility service providers [Docket No. 39].  A final order was entered on February 28, 2007 [Docket No. 168].

### 5.    Interim Compensation for Professionals

On the Petition Date, the Debtor filed its *Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code.*

The Debtor sought authority to implement procedures for the application, interim allowance and payment of Estate Professionals on a monthly basis.  On February 28, 2007, the Court entered its order approving the monthly compensation procedures proposed by the Debtor [Docket No. 172].  Attached hereto as Exhibit "A" is a chart reflecting compensation accrued but unpaid, by Estate Professionals through February 29, 2008.

### 6.    Lease Rejection

On the Petition Date, the Debtor filed its *Motion for Order Under Sections 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtor to (1) Reject Certain Unexpired Leases of Nonresidential Real Property, and (2) Abandon any Personal Property Located at Such Premises.*

The Debtor, after consideration of its current and expected future business objectives, and in connection with efforts to reduce costs, determined that certain leases were unnecessary to the continued operation of the Debtor's business, had no value to the estate, and should therefore be rejected.  The annual rent payable by the Debtor on account of the leases to be rejected as of the Petition Date totaled approximately $6 million.

17

The leases premises may have contained various items of personal property owned by the Debtor. The Debtor believed that any personal property at these locations had inconsequential value to the estate when considered in relation to the anticipated expense of sale and any carrying costs associated therewith. Accordingly, the Debtor sought authority to reject such leases effective as of the Petition Date.

The Bankruptcy Court entered an order granting the relief requested on February 28, 2007 [Docket No. 173]. Since February 28, 2007, the Debtor has filed several motions seeking similar relief with respect to real property leases. Orders have been entered granting the relief requested in these motions.

### 7. Rejection Of Executory Contracts

On the Petition Date, the Debtor filed its *Motion for the Entry of an Order Authorizing the Debtor to Reject Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365.*

On November 15, 2004, the Debtor entered into a master lease agreement with First Financial Corporate Services, Inc. The Debtor determined that, as of the Petition Date, it no longer needed certain leased equipment which was the subject of this Motion. Prior to the Petition Date, the Debtor notified First Financial Corporate Services, Inc. of its intention to reject the applicable leases and requested that First Financial Corporate Services, Inc. retrieve its equipment.

Through this Motion, the Debtor sought the entry of an order, pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, authorizing and approving the Debtor's rejection of the Rejected Leases effective as of the Petition Date. The Court entered an order granting the relief requested on February 28, 2007 [Docket No. 175]. During the course of the Chapter 11 case, as the Debtors operations continued to wind down and additional equipment leases became unnecessary, the Debtor obtained similar relief.

### 8. Sale of Loans

On the Petition Date, the Debtor filed its *Motion for Order Authorizing the Debtor to (A) Sell Loans That Have Closed and Been Funded, (B) Honor Loan Commitments Upon Which the Debtor Closed Prepetition But Was Unable to Fund, and (C) Honor Existing Obligations and Incur New Obligations in the Ordinary Course of Its Business in Connection With the Servicing of Loans.*

By this Motion, the Debtor sought entry of an order by the Court authorizing the Debtor to (a) sell loans that have closed and been funded, (b) honor those prepetition loan commitments upon which the Debtor closed but was unable to fund, and (c) honor existing obligations and incur new obligations in the ordinary course of business in connection with the servicing of loans

The Debtor, in the ordinary course of its business, regularly sold the loans that it originated. Pursuant to this Motion, the Debtor sought authority to sell the remaining loans in its possession. These loans were closed and funded prior to the shut down of the Debtor's

wholesale and retail origination operations. To maximize the value of these loans, the Debtor needs to sell them in accordance with customary industry practices.

The Debtor, in an abundance of caution, sought the entry of an order authorizing the loan sales provided for herein, because certain cease and desist orders contain which contained provisions that prohibited the Debtor from authorizing or executing financial transactions in excess of $250,000, except for the payment of wages and salaries to employees, contractors, officers, or other members of the Debtor in the normal course of the Debtor's management, without prior written approval from the applicable regulatory entity. The Debtor did not believe that the intent behind this prohibition in certain of the cease and desist orders was to prevent the sale of its loans in the ordinary course of business. In addition, the Debtor believed that the sale of such loans – under the supervision and control of the Bankruptcy Court – was necessary to ensure that their value is maximized for the benefit of all of the Debtor's creditors

The Debtor also sought authorization to continue to honor, as it determines to be appropriate its servicer obligations and practices in the ordinary course of business, including, without limitation and subject to available funding, the payment of certain advances. If the Debtor did not continue to honor these obligations and practices in the ordinary course of its business, it risked being replaced as servicer, with the loss of future servicing revenue

The Bankruptcy Court entered an order granting the relief requested in this motion on February 7, 2007 [Docket No. 38]. An amended order was entered by the Court on March 19, 2007 [Docket No. 304].

### 9.    Retention of Key Professionals

The Debtor sought to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP as its bankruptcy counsel with regard to the filing and prosecution of its Chapter 11 Case. An order was entered authorizing that retention, effective as of the Petition Date on February 28, 2007 [Docket No. 169].

Debtor also sought employ (a) Scouler & Co., LLP to provide restructuring services to the Debtor and to assist the Debtor in preserving and marketing its remaining mortgage servicing business, and (b) Daniel Scouler, a member with Scouler & Co. LLP, as Chief Restructuring Officer of the Debtor, *nunc pro tunc* to the Petition Date, pursuant to section 327(a) of the Bankruptcy Code and on the terms set forth herein and in the engagement letter between the Debtor and SA. The Bankruptcy Court authorized this retention on February 28, 2007 [Docket No. 170].

### 10.    Ordinary Course Professionals

On the Petition Date, the Debtor filed its *Motion to Authorize the Debtor to Retain, Employ and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code,* without having to file applications to employment and compensation with respect to such professionals. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal, actuarial and employee benefit consulting

services.  On March 1, 2007, the Court entered its order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtor [Docket No. 189].

## 11.    Cash Collateral Use And DIP Financing

Debtor required the use of RFC's cash collateral and possibly a debtor in possession financing in order to operate efficiently as it liquidated its assets.  Debtor and RFC negotiated and agreed on terms pursuant to which Debtor would receive debtor in possession financing ("DIP Financing").

On the Petition Date, Debtor filed its *Motion for Interim Order (1) Authorizing Mortgage Lenders Network USA, Inc., as Debtor In Possession, to Use Cash Collateral and Continue Certain Financial Arrangements, (2) to Incur Post-Petition Secured Indebtedness, (3) Granting Security Interest and Super-Priority Claims Pursuant to 11 U.S.C. Sections 364(c) & (d), (4) Granting Adequate Protection, (5) Modifying Automatic Stay and (6) Setting Final Hearing.*  On February 7, 2007, the Court entered its Interim Order [Docket No. 42] which authorized the Debtor's limited use of cash collateral and ability to borrow through March 30, 2007 pursuant to the terms of the cash collateral budget, authorized the Debtor to incur postpetition secured indebtedness, to inter into the proposed DIP Credit Agreements and granted certain adequate protection to the Lender Group.  The final hearing concerning the use of cash collateral and financing was held on April 4, 2007 and a final order was entered that day [Docket No. 413] (the "Final DIP Financing Order").

## D.    Appointment of Committee

On February 21, 2007, at a meeting of the twenty (20) largest unsecured creditors of the Debtor held at the Office of the United States Trustee in Wilmington, Delaware, the U.S. Trustee appointed the Committee as the representative of the Debtor's general unsecured creditor constituency in the Chapter 11 Case.  The Committee was composed of Merrill Lynch Mortgage Lending, Inc., Lehman Brothers Bank, FSB, Wachovia Bank, N.A., Duffy White Construction LLC, MTM Technologies, Inc., Workstage, LLC, and David D. Hagburg.  The Committee retained Blank Rome LLP as counsel and FTI Consulting, Inc. as its financial advisors to assist in the Committee's involvement in the Chapter 11 Case.

## E.    Bar Date for Filing Proofs of Claim

On November 7, 2007, the Debtor filed a motion requesting that the Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion").  The Bar Date Motion was granted by the Court on November 28, 2007 (the "Bar Date Order") and established February 1, 2008 as the deadline for filing Proofs of Claim with the Court for any claims against the Debtor arising prior to the Petition Date (the "General Bar Date").  A schedule of the filed Proofs of Claims is being maintained by Trumbull, the Debtor's noticing and claims agent.

## F.    Filing of Statements and Schedules

On March 14, 2007, the Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtor based on its books and records.

## G.    Other Postpetition Activities

Subsequent to the Petition Date, the Debtor directed substantially all of its efforts, and all of the efforts of its professionals, towards streamlining and reducing operations, reducing costs and the liquidation of its hard assets and remaining servicing operations. The Debtor's overarching goal was to maximize the value of such assets while minimizing the expenses associated with maintaining such assets.

### Consolidation of Operations and Costs Savings

The Debtor consolidated its operations from multiple locations down to one location at corporate headquarters. The Debtor has rejected multiple, burdensome real estate leases and executory contracts. The Debtor reduced its workforce to approximately six independent contractors/consultants. Debtor consolidated its technology infrastructure into a smaller platform using an outsourced facility to house and protect its hardware and data. This significantly reduced its operating costs. Debtor also created an alternative data repository and retrieval system to its existing servicing system saving the company approximately $150,000 per month in administrative expenses to the estate.

### Significant Asset Sales

The Debtor has liquidated most of its significant assets. In particular, the Debtor has, among other things (a) sold approximately $400 million of mortgage loans; (b) transferred approximately $12.5 billion of mortgage servicing assets (c) sold its interest in an airplane, resulting in $896,000 in proceeds to the estate, (d) marketed and sold its mortgage loan servicing platform, (e) sold various properties from its real estate portfolio, and (f) certain office equipment and furniture no longer needed in the Debtor's operations.

### Other Significant Recoveries

The Debtor has also engaged in successful negotiations with the Connecticut Development Authority that resulted in the payment of $1,292,181.04 to the Debtor's estate, with the potential for additional payments to be made to the Debtor. The Debtor has engaged in litigation with Sovereign Bank ("Sovereign") that, to date, has resulted in the payment of $787,500 to the Debtor's estate, with the potential for the payment of additional funds by Sovereign. The Debtor has also negotiated a complex, multi-party settlement over the Debtor's interest in certain rights to service certain single-family mortgages for the Federal Home Loan Mortgage Corporation (and resolved an objection thereto) which resulted in the estate receiving $9,185,365.36 on March 10, 2008.

### Continuing Activities

The Debtor continues to gather and liquidate its remaining assets. The Debtor has retained a professional to assist with analysis, marketing and possible sale of a certain option to

21

purchase real estate which may produce value to the estate. The Debtor has also retained a special sales advisor to assist with the marketing of certain loans which the Debtor anticipates receiving in connection with the resolution of matters with the Federal Home Loan Mortgage Corporation mentioned above and identified.

**H.    Significant Postpetition Litigation**

The Debtor has also engaged in numerous contested matters and adversary proceedings to protect its rights as debtor in possession or to otherwise maximize the value of its estate for the benefit of its creditors. Since the Petition Date, these litigation matters have included (a) the defense of a complaint filed by RFC seeking the turnover of $9.1 million in funds held by the estate in certain escrow accounts; (b) the negotiation and settlement of several relief from stay motions related to loans that had been sold by the Debtor prior to the Petition Date; (c) the filing of a complaint against Wells Fargo Bank, N.A. to recover $2,274,265 in advances made by MLN prior to the transfer of servicing obligations and seeking to avoid any unrecorded ownership interests in certain properties to which MLN had legal title as of the petition date; and (d) the defeat of a relief from stay motion from St. Paul Insurance Company through which the insurer sought to cancel the financial bond and computer crime policy held by the Debtor.

**IV.**

**DESCRIPTION OF THE PLAN**

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES V THROUGH XIII BELOW (IN ADDITION TO THE DISCUSSION OF THE CREDITOR SETTLEMENT DISCUSSIONS IN ARTICLE III ABOVE).  THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT DEBTOR'S PROPOSED PLAN OF LIQUIDATION.  IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL.  ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

**V.**

**ADMINISTRATIVE CLAIMS, PROFESSIONAL
FEES AND PRIORITY TAX CLAIMS**

**A.    Introduction**

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code.  As such, Debtor has not placed the following Claims in a Class:

22

1.    **Administrative Claims**

Each Holder of an Allowed Administrative Claim shall receive, from Net Plan Proceeds, without interest, Cash equal to the Allowed amount of such Claim, unless such Holder shall have agreed to different treatment of such Claim, at the sole option of the Debtor or the Liquidating Debtor, as the case may be: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holders of such Claims and the Debtor or the Liquidating Debtor, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a final decree or an order converting or dismissing the case.

Holders of Administrative Claims (including, without limitation, Professionals) requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code that do not file such requests by the applicable deadline provided for herein shall be forever barred from asserting such claims against the Debtor, its Estate, the Liquidating Debtor, or its successors or assigns, or its property.  Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

Notwithstanding any provision in the Plan regarding payment of Administrative Claims to the contrary, and without waiver of any argument available that such Claim is already time-barred by prior orders of the Bankruptcy Court, all Administrative Claims that are required to be Filed and not Filed by the Administrative Claim Bar Date shall be deemed disallowed and discharged.  As provided herein, the Claims Reserve Account will include funds sufficient to cover the aggregate asserted amount of all disputed Administrative Claims.  Without limiting the foregoing, all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date.

As indicated, a bar date of February 1, 2008 was established for the filing of Administrative Claims.  The universe of disputed Administrative Claims is small.  Various equipment lessors have filed Administrative Claims in respect of alleged missing equipment. Debtors dispute these claims (and, in particular, whether they are entitled to an administrative priority).  The only other material, disputed Administrative Claim was filed with which Debtor disagrees: a class action proof of claim alleging that Debtor violated the WARN Act prior to the Petition Date, and alleging class damages exceeding $40 million (the "WARN Act Claim"). Debtor believes the WARN Act Claim is meritless.  Given the magnitude of the WARN Act Claim, it will have to be resolved prior to Confirmation.

B.    **Professional Fees**

The Liquidating Debtor shall pay Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date plus post-Effective Date fees approved by the Responsible Officer.

58302-001\DOCS_LA:179959.9

The Bankruptcy Court must rule on and allow all Professional Fee Claims before the fees will be owed and paid. For all Professional Fee Claims, except Bankruptcy Clerk's Office fees, the fees and expenses of the Claims Agent, and U.S. Trustee's fees, the Professional in question must file and serve a properly noticed final fee application and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses Allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

The Liquidating Debtor may retain and compensate professionals for services rendered following the Effective Date without order of the Bankruptcy Court. If the Liquidating Debtor objects in writing to the payment of any compensation, such disputed amount shall not be paid prior to the earlier of the resolution of such dispute or a ruling by the Bankruptcy Court.

Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must File and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

Debtors estimate that there will be approximately $700,000 of accrued and unpaid fees owing to Professionals as of the Effective Date.

## C.      Priority Tax Claims

On the later to occur of (i) the Effective Date or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtor shall pay to each Holder of an Allowed Priority Tax Claim from the Net Plan Proceeds the Allowed amount of such Allowed Priority Tax Claim without interest from Petition Date.

There are currently Priority Tax Claims filed by the Internal Revenue Service and other taxing authorities aggregating $12 million. The Debtor believes that none of these Claims has merit.

**VI.**

**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

## A.      Summary

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to

24

the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**B.**     **Classification and Treatment of Claims against the Debtor**

The classification of Claims and Equity Interests against the Debtor pursuant to the Plan, is as follows:

| Class | Status | Voting Rights |
|-------|--------|---------------|
| Class 1 – Priority Claims | Impaired | Entitled to Vote |
| Class 2 – Secured Claims (if any)[3] | Impaired | Entitled to Vote |
| Class 3 – Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 – Subordinated Claims | Impaired | Not Entitled to Vote |
| Class 5 – Equity Interests | Impaired | Not Entitled to Vote |

**1.**     **Class 1 – Priority Claims**

a.     Classification:

Class 1 consists of the Priority Claims against the Debtor.

b.     Treatment:

The Liquidating Debtor shall pay from the Net Plan Proceeds the Allowed amount of each Class 1 Priority Claim to each Entity holding a Class 1 Priority Claim as soon as practicable following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Debtor shall pay each Entity holding a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date; *provided*, *however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity.

c.     Voting:

Class 1 is an Impaired Class and Holders of Class 1 Claims are entitled to vote on the Plan.

**2.**     **Class 2 – Secured Claims**

a.     Classification:

Class 2 consists of any Secured Claims. Each Holder of a Class 2 Claim constitutes a separate subclass under the Plan.

b.     Treatment:

---

[3] Each Holder of a Class 2 Claim (to the extent any such Claims exist) constitutes a separate subclass under the Plan.

58302-001\DOCS_LA:179959.9

To the extent any Secured Claims exist, at the option of the Debtor or Liquidating Debtor, as applicable, (i) each Holder (if any) of an Allowed Class 2(B) Claim shall receive on the Effective Date or as soon thereafter as practicable the proceeds from any sale of the collateral securing such Claim in an amount equal to the value of the Creditor's interest in the collateral securing such Claim in full and complete satisfaction of such Claim, or (ii) the collateral securing such Creditor's Claim shall be abandoned to such Creditor, in full and complete satisfaction of such Claim.

        c.     <u>Voting:</u>

Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote on the Plan.

### 3.     **Class 3 – Unsecured Claims**

        a.     <u>Classification:</u>

Class 3 consists of the Claims of Holders of Unsecured Claims.

        b.     <u>Treatment:</u>

Each Holder of an Allowed Unsecured Claim shall receive a Pro Rata share of the Net Plan Proceeds, as determined by the Liquidating Debtor pursuant to the terms of the Plan.

        c.     <u>Voting:</u>

Class 3 is an Impaired Class and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

### 4.     **Class 4 – Subordinated Claims**

        a.     <u>Classification:</u>

Class 4 consists of the Claims of Holders of Subordinated Claims.

        b.     <u>Treatment:</u>

The value of the Plan Assets are not expected to be sufficient to satisfy the Allowed Claims of Classes 1, 2 and 3 in full.  Accordingly, there shall be no distribution to the Holders of Class 4 Claims.

        c.     <u>Voting:</u>

Holders of Class 4 Claims will receive no distribution under the Plan and therefore are deemed to have rejected the Plan.  Accordingly, Class 4 Claims are not entitled to vote.

### 5.     **Class 5 – Equity Interests**

        a.     <u>Classification:</u>

58302-001\DOCS_LA:179959.9

Class 5 consists of all Equity Interests in the Debtor.

      b.     <u>Treatment</u>:

The value of the Plan Assets are not expected to be sufficient to satisfy the Allowed Claims of Classes 1, 2, and 3 in full. Accordingly, there shall be no distribution on account of Class 5 Equity Interests. Upon the Effective Date, the Equity Interests will be deemed canceled and will cease to exist.

      c.     <u>Voting</u>:

Holders of Class 5 Equity Interests will receive no distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Class 5 Equity Interests are not entitled to vote.

## VII.

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**    **<u>Voting Classes</u>**

Each Holder of an Allowed Claim in Classes 1 and 3 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

**B.**    **<u>Acceptance by Impaired Classes</u>**

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**C.**    **<u>Presumed Acceptance/Rejection of Plan</u>**

Classes 4 and 5 shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote.

**D.**    **<u>Nonconsensual Confirmation</u>**

Because Classes 4 and 5 are deemed to reject the Plan by operation of law, the Debtor will request the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtor reserves the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

E.    **How to Vote**

A form of Ballot is being provided to Creditors in Classes 1 and 3 by which Creditors in such Class may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives you one important choice to make with respect to the Plan – you can vote <u>for</u> or <u>against</u> the Plan. To vote on the Plan, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. The Claims Agent will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED NO LATER THAN 4:00 P.M. EASTERN TIME ON _____, 2008 AT THE FOLLOWING ADDRESS:

<b>If by overnight courier or hand delivery:</b>

<b>Wells Fargo Trumbull<br>
45 Broadway, 14th Floor<br>
New York, NY  10006<br>
Attn:  Ronda K. Collum, Vice President</b>

<b>If by standard mail (including U.S. Express Mail):</b>

<b>Wells Fargo Trumbull<br>
45 Broadway, 14th Floor<br>
New York, NY  10006<br>
Attn:  Ronda K. Collum, Vice President</b>

<b>DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.</b>

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY ADDRESSING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY SUBMITTED BALLOTS WILL NOT BE COUNTED.

<b>VIII.</b>

<b>MEANS FOR IMPLEMENTATION OF THE PLAN</b>

A.    **Available Cash.**

On or as soon as practical following the Effective Date, the Claims Reserve Account shall be opened by the Disbursing Agent and funded with the Available Cash to the extent of any unencumbered Cash, which funds shall constitute Plan Proceeds. Thereafter, from time to time, upon receipt of any Liquidation Proceeds or any Litigation Recovery, such funds will be

28

promptly delivered by the Liquidating Debtor to the Disbursing Agent for deposit into the Claims Reserve Account and shall become part of the Plan Proceeds.

**B.    Handling of Plan Assets and Collection of Plan Proceeds.**

On the Effective Date, the Plan Assets and any other property of the Estate shall revest in the Liquidating Debtor, free and clear of all Claims and Liens other than those Liens recognized by the Plan. The Plan Assets shall be held by the Liquidating Debtor in trust for Creditors and shall be distributed only in accordance with the Plan. From and after the Effective Date, the Liquidating Debtor shall retain and pursue the Litigation on such terms and conditions as are consistent with the interests of Creditors and the reasonable business judgment of the Liquidating Debtor, sell or liquidate Plan Assets, and collect the accounts receivable, if any, of the Debtor. In addition, from and after the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, the Liquidating Debtor shall be free to operate without any limitation or restriction by, and without any requirement to comply with, the Bankruptcy Code, Bankruptcy Rules, or Guidelines of the United States Trustee. All Cash, all Liquidation Proceeds, and all Litigation Recoveries realized or obtained by the Liquidating Debtor shall be promptly delivered to the Disbursing Agent for deposit into the Claims Reserve Account and such funds shall be held in trust by the Disbursing Agent as Plan Proceeds. Except as otherwise provided in the Plan and the Confirmation Order, such Plan Proceeds shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan. To the extent required to make distributions to the Holders of Allowed Claims, fund the Claims Reserve Account, pay Plan Expenses, and otherwise implement the Plan, all Plan Proceeds shall be held in trust by the Disbursing Agent and shall be distributed to Creditors in accordance with section 1123 of the Bankruptcy Code.

**C.    Litigation.**

Except as otherwise provided in the Plan, all Litigation is retained and preserved pursuant to section 1123(b) of the Bankruptcy Code. From and after the Effective Date all Litigation will be prosecuted or settled by the Liquidating Debtor. To the extent any Litigation is already pending on the Effective Date, the Liquidating Debtor as successor to the Debtor will continue the prosecution of such Litigation. Any Litigation Recovery from the Litigation will be deposited in the Claims Reserve Account as Plan Proceeds.

**D.    Payment of Plan Expenses.**

All Plan Expenses may be paid by the Disbursing Agent from the Claims Reserve Account without further notice to Creditors or approval of the Bankruptcy Court. Any disputes concerning the payment of Plan Expenses shall be submitted to the Bankruptcy Court for resolution.

**E.    Distribution of Plan Proceeds.**

The Plan Proceeds shall be used to satisfy the payments required under the Plan, provided that the Disbursing Agent shall only distribute Net Plan Proceeds to the Holders of Allowed Claims in such amounts and at such times as are set forth in the Plan. No payments or

distributions shall be made by the Disbursing Agent on account of Disputed Claims unless and to the extent such Claims become Allowed Claims. The Net Plan Proceeds allocated to Disputed Claims will not be distributed but will be held in the Claims Reserve Account by the Disbursing Agent in accordance with the Plan pending resolution of such Disputed Claims.

**F.**     **Post-Confirmation Operations of the Liquidating Debtor.**

Following the Effective Date the Liquidating Debtor shall sell or dispose of any remaining assets, collect any accounts receivable, generate Liquidation Proceeds, prosecute or settle the Litigation, promptly transfer all receipts and collections to the Disbursing Agent for deposit into the Claims Reserve Account, and generally administer the Plan.

**G.**     **Power and Authority of Responsible Officer.**

From and after the Effective Date the Liquidating Debtor will be managed and governed by the Responsible Officer who shall act as the representative of the Liquidating Debtor. The Responsible Officer charged with administering the Liquidating Debtors shall initially be Daniel Scouler. Mr. Scouler's resume is attached hereto as Exhibit "C". Activities of the Liquidating Debtor as permitted and limited under the Plan will be managed by the Responsible Officer. The Responsible Officer may use lower priced employees of his firm as he deems appropriate. Compensation and reimbursement of the Responsible Officer, and any lower priced employees from his or her firm, shall be considered Plan Expenses. Confirmation of the Plan shall constitute the appointment of the Responsible Officer by the Bankruptcy Court as the representative of the Liquidating Debtor to (a) exercise the rights, power and authority of the Liquidating Debtor under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, (b) retain professionals to represent the Liquidating Debtor in performing and implementing the Plan, (c) marshal and liquidate the Plan Assets and to collect the Plan Proceeds for the benefit of Creditors, (d) prosecute the Litigation and otherwise attempt to collect or realize upon the Plan Assets, (e) resolve Disputed Claims and effectuate distributions to Creditors under the Plan, and (f) otherwise implement the Plan, wind up the affairs of the Debtor and close the Chapter 11 Case. The compensation arrangements with the Responsible Officer shall be subject to approval by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Responsible Officer will be deemed to have retained the Debtor's Professionals under the arrangements existing on the Effective Date, without any need for new retention agreements or further orders of the Bankruptcy Court. The Confirmation Order shall provide that the Responsible Officer is authorized to execute a certificate of dissolution for the Liquidating Debtor pursuant to applicable non-bankruptcy law, at such time as the Liquidating Debtor has fully wound up its affairs in accordance with applicable law pursuant to the provisions of the Plan. The Responsible Officer shall serve until the Liquidating Debtor is dissolved and a final decree is entered closing the Chapter 11 Case, unless earlier removed by the Bankruptcy Court for cause shown, after notice and a hearing. Upon the removal of the Responsible Officer for cause, if the sitting Responsible Officer becomes unable, unavailable or unwilling to continue to serve, the Bankruptcy Court will appoint a replacement upon the request of any party in interest. The Responsible Officer shall be responsible for ensuring that the Liquidating Debtor complies with its obligation to pay statutory fees under 28 U.S.C. § 1930(a)(6) and the Responsible Officer shall file all post-Confirmation reports required by the Bankruptcy Rules, the Bankruptcy Court, the Local Bankruptcy Rules, or any applicable Guidelines of the United States Trustee.

**H.    Liquidation and Dissolution of the Liquidating Debtor.**

The Liquidating Debtor shall conduct no business following the Effective Date other than winding up its affairs in accordance with applicable law and the provisions of the Plan. Without limiting the generality or effect of the foregoing, following the Effective Date the Liquidating Debtor shall: (i) undertake those transactions that are necessary, advantageous or practicable to obtain the maximum value from the Plan Assets; and (ii) exercise its best efforts and endeavor in good faith and without undue delay to liquidate all of the Plan Assets and to successfully prosecute the Litigation. Pursuant to applicable bankruptcy and non-bankruptcy law, the Liquidating Debtor (acting through the Responsible Officer) shall be authorized to (i) wind up its affairs and dissolve, and (ii) put into effect and carry out the terms of the Plan and any orders of the Bankruptcy Court entered in the Chapter 11 Case, without further action by its boards of directors or stockholders.

**I.    Full and Final Satisfaction.**

Commencing upon the Effective Date, the Disbursing Agent shall be authorized and directed to distribute the amounts required under the Plan to the Holders of Allowed Claims according to the provisions of the Plan. Upon the Effective Date, all Debts of the Debtor shall be deemed fixed and adjusted pursuant to the Plan and the Debtor shall have no further liability on account of any Claims or Interests except as set forth in the Plan. All payments and all distributions made by the Disbursing Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims; provided, however, that nothing contained in the Plan, or in any other provision of the Plan, shall be deemed to constitute or result in a discharge of the Debtor under Bankruptcy Code section 1141(d).

**J.    Distribution Procedures.**

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all amounts to be paid by the Disbursing Agent under the Plan shall be distributed in such amounts and at such times as is reasonably prudent. On the Effective Date, or as soon as practicable thereafter, the Disbursing Agent shall: (i) marshal all then available Plan Proceeds; (ii) to the extent of unencumbered Cash or Cash distributable to the Holders of Allowed Claims, establish and fund the Claims Reserve Account pursuant to Section 5(L) of the Plan; (iii) promptly pay the Holders of (a) Allowed Administrative Claims, (b) Allowed Professional Fee Claims, (c) Allowed Priority Tax Claims and (d) the Holders of Allowed Claims in Class 1, Class 2 and Class 3, as provided for under the Plan; (iv) with respect to Class 2 Claimants who did not receive proceeds from the sale of their collateral, arrange for the Liquidating Debtor to abandon to such Creditors the collateral securing their respective Claims; and (v) make interim and final distributions of Plan Proceeds to the Holders of Allowed Class 3 Claims from the Claims Reserve Account in the amounts and according to the priorities set forth in the Plan. Notwithstanding any provision to the contrary in the Plan, distributions may be made in full or on a Pro Rata basis depending on (i) the amount of the Allowed Claim, (ii) the then available Plan Proceeds in the Claims Reserve Account, and (iii) the then anticipated Plan Proceeds. The Disbursing Agent shall make the Cash payments to the Holders of Allowed Claims: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank selected by the Disbursing Agent in its sole discretion, or by wire transfer from a domestic bank, at the Disbursing Agent's option,

and (b) by first-class mail (or by other equivalent or superior means as determined by the Disbursing Agent).

## K.    Disbursing Agent.

The Disbursing Agent may employ or contract with other entities to perform the obligations created under the Plan. Any third party Disbursing Agent shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with the Plan or any functions or responsibilities adopted under the Plan which amounts may be deducted from the Claims Reserve Account as Plan Expenses. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. To the extent that the Liquidating Debtor acts as the Disbursing Agent, the Liquidating Debtor shall not receive a fee for such services, although the Liquidating Debtor may employ and pay persons or entities salaries, wages or ordinary compensation for services performed.

## L.    Claims Reserve Account.

On or as soon as practicable after the Effective Date, the Disbursing Agent shall (a) to the extent of any Cash or, where applicable, unencumbered Cash, create and fund the Claims Reserve Account, and (b) periodically deposit the Cash from Plan Proceeds into the Claims Reserve Account to satisfy the obligations created under the Plan. The Claims Reserve Account shall contain the following five sub-accounts: (1) Secured, (2) Administrative, (3) Priority Claims, (4) Plan Expenses, and (5) Allowed Unsecured Claims. Each sub-account within the Claims Reserve Account shall contain an amount of Cash deemed sufficient by the Liquidating Debtor for the payment of Allowed Claims in accordance with the priorities and amounts set forth in Article 3, all anticipated Plan Expenses, and Disputed Claims. The Disbursing Agent shall be authorized to transfer funds among sub-accounts as necessary to replenish any sub-accounts as and when distributions are made to Creditors. All Plan Expenses may be deducted and paid from sub-account 5 without further order of the Bankruptcy Court. Subject to the priorities established under the Bankruptcy Code, the Disbursing Agent shall periodically transfer all earnings and interest income on the Claims Reserve Account for deposit to and distribution from sub-account 5. Unless otherwise provided in the Confirmation Order, the Claims Reserve Account shall be invested by the Disbursing Agent in a manner consistent with the objectives of section 345(a) of the Bankruptcy Code.

## M.    Resolution of Disputed Claims.

All objections to Claims shall be filed and served not later than 365 days following the Effective Date; provided, however, such date may be extended beyond 365 days by the Bankruptcy Court for cause shown. If an objection is not timely filed by the deadline established in Section 5(M) of the Plan, any remaining Disputed Claims shall be deemed to be Allowed Claims for purposes of the Plan. Unless otherwise provided in the Confirmation Order the

32

Liquidating Debtor shall be authorized to settle, or withdraw any objections to, any Disputed Claim following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan. Under no circumstances will any distributions be made on account of Disallowed Claims.

N.      **Reserve Provisions for Disputed Claims.**

The Disbursing Agent shall implement the following procedures with respect to the allocation and distribution of Cash in the Claims Reserve Account, after payment of all senior Claims, to the Holders of Disputed Claims that become Allowed Claims:

(i)     Cash respecting Disputed Claims shall not be distributed, but, if necessary, shall be withheld by the Disbursing Agent in an amount equal to the amount of the distributions that would otherwise be made to the Holders of such Claims if such Claims had been Allowed Claims, based on the Disputed Claims Amount.

(ii)    All Holders of Allowed Unsecured Claims shall be entitled to receive interim distributions under the Plan. No distributions may be made to the Holders of Allowed Unsecured Claims unless adequate reserves are established for the payment of Disputed Claims, and sufficient funds are also reserved for payment of expected Plan Expenses. Upon the Final Resolution Date, after payment of all senior Claims, all amounts (if any) remaining in sub-accounts 1-5 of the Claims Reserve Account, after reservation of an appropriate amount for anticipated Plan Expenses, shall be transferred to sub-account 4 for final distribution to the Holders of Allowed Class 3 Claims.

(iii)   Where only a portion of a Claim is Disputed, at the option of the Liquidating Debtor or Disbursing Agent, as applicable, interim or partial distributions may (but are not required to) be made with respect to the portion of such Claim that is not Disputed.

(iv)    For the purposes of effectuating the provisions of Section 5(N) of the Plan, the Bankruptcy Court may estimate the amount of any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be Allowed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of distribution under the Plan. In lieu of estimating the amount of any Disputed Claim, the Bankruptcy Court or the Disbursing Agent may determine the Disputed Claims Amount to be reserved for such Disputed Claim, or such amount may be fixed by agreement in writing by and between the Liquidating Debtor and the Holder thereof.

(v)     When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the

provisions of the Plan, Cash equal to a Pro Rata Share of the Cash set aside for Disputed Claims within the applicable sub-account of the Claims Reserve Account, but in no event shall such Holder be paid more than the amount that would otherwise have been paid to such Holder if the Claim (or the Allowed portion of the Claim) had not been a Disputed Claim.

(vi)     Interim distributions may be made from time to time to the Holders of Allowed Claims prior to the resolution by Final Order or otherwise of all Disputed Claims, provided that interim distributions shall be made no less frequently than once during each four month period following the month of the Initial Distribution Date, and further provided the aggregate amount of Cash to be distributed at such time from the Claims Reserve Account is practicable in comparison to the anticipated costs of such interim distributions.  Notwithstanding the foregoing, subject to Section 5(Q) of the Plan, no interim distribution shall be made to any Creditor whose distribution would be less than $50.

(vii)    No Holder of a Disputed Claim shall have any Claim against the Cash reserved with respect to such Claim until such Disputed Claim shall become an Allowed Claim.  In no event shall any Holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) from the Debtor, the Liquidating Debtor, or the Claims Reserve Account any payment (x) which is greater than the amount reserved for such Claim by the Bankruptcy Court pursuant to Section 5(N) of the Plan, or (y) except as otherwise permitted under the Plan, of interest or other compensation for delays in distribution.  In no event shall the Liquidating Debtor have any responsibility or liability for any loss to or of any amount reserved under the Plan.

(viii)   To the extent a Disputed Claim ultimately becomes an Allowed Claim in an amount less than the Disputed Claim Amount reserved for such Disputed Claim, then the resulting surplus of Cash shall be retained in the Claims Reserve Account and shall be distributed among the Holders of Allowed Claims until such time as each Holder of an Allowed Claim has been paid the Allowed amount of its Claim.

## O.    **Allocation of Distributions.**

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## P.    **Rounding.**